927 A.2d 1269

TRACEY A. JOHNSON AND CHRISTOPHER JOHNSON, HER
HUSBAND, PLAINTIFFS–RESPONDENTS, v. BENEDICT
A. SCACCETTI, DEFENDANT–APPELLANT.

Argued March 5, 2007—Decided July 31, 2007.

*Anthony Young* argued the cause for appellant (*Parker McCay*, attorneys; *Stacy L. Moore, Jr.*, on the briefs).

*David T. Wheaton* argued the cause for respondents (*Levinson Axelrod*, attorneys; *Mr. Wheaton* and *Matthew P. Pietrowski*, on the briefs).

*Amos Gern* submitted a brief on behalf of amicus curiae Association of Trial Lawyers of America–New Jersey (*Starr, Gern, Davison & Rubin*, attorneys; *Mr. Gern* and *Robert L. Pitkofsky*, on the brief).

*Wayne J. Positan*, President, submitted a brief on behalf of amicus curiae New Jersey State Bar Association (*Mr. Positan*, attorney; *Mr. Positan* and *Gerald H. Baker*, of counsel; *Mr. Baker, Amirali Y. Haidri* and *Joseph A. Spinella*, on the brief).

Justice ALBIN delivered the opinion of the Court.

An automobile insurance policyholder who opts for the limitation on lawsuit threshold of the Automobile Insurance Cost Reduction Act (AICRA), *N.J.S.A.* 39:6A–1.1 to –35, accepts, in exchange for lower insurance premium payments, restrictions on the right to sue for noneconomic damages (pain and suffering) if injured in an accident.[1] A policyholder bound by the lawsuit threshold may not sue for noneconomic damages unless she suffers "a bodily injury which results in death; dismemberment; significant disfigurement or significant scarring; displaced fractures; loss of a fetus; or a permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement." *N.J.S.A.* 39:6A–8(a).

In this case, which is governed by the lawsuit threshold, plaintiff Tracey Johnson suffered numerous injuries in an automobile accident, including back injuries and two chipped or broken teeth. She and her husband filed a negligence action. Both the trial court and Appellate Division found that her chipped teeth constituted "displaced fractures." Because Tracey vaulted the lawsuit threshold in that category, both courts also found that, for the purpose of calculating noneconomic damages, the jury could consider all of her other injuries, regardless of whether those injuries independently satisfied a threshold category.

A jury awarded Tracey $2,500,000 in damages for pain and suffering and her husband $500,000 in damages for loss of consortium. The trial court determined that award to be grossly excessive and remitted it, allocating $1,500,000 to Tracey and $250,000 to her husband. The Appellate Division reversed and reinstated the jury award.

We now hold that chipped teeth are not "displaced fractures" under AICRA. We further hold that once a plaintiff suffers a single bodily injury that satisfies a threshold category, the jury

---

1 " 'Noneconomic loss' means pain, suffering and inconvenience." *N.J.S.A.* 39:6A–2(i).

may consider all other injuries in determining noneconomic damages. We also affirm the Appellate Division's conclusion that, as a matter of law, Tracey's spinal injury satisfied the limitation on lawsuit threshold of *N.J.S.A.* 39:6A–8(a), entitling her to recover noneconomic damages for all of her injuries proximately caused by the accident. Last, we affirm the Appellate Division's decision to reverse the remittitur and reinstate the jury award.

## I.

### A.

On November 12, 2001, plaintiff Tracey Johnson was driving a Ford Windstar minivan on Route 130 in Bordentown when defendant Benedict Scaccetti disregarded a red light at the Crosswick Street intersection, colliding into the passenger's side of her vehicle.[2] The force of the collision knocked the Ford minivan over and sent it skidding down the road on its driver's side until it struck a median, at which point the van rolled over right side up. As the van slid on its side toward the median, Tracey feared that her arm would be "chewed off" and that she was going to die.

Emergency personnel arrived at the scene and transported Tracey to Robert Wood Johnson Hospital in Hamilton where x-rays revealed that she had not broken her neck. She was released from the hospital wearing a cervical collar and told to see her doctor the next day.

Tracey, age thirty-nine, first called her husband, plaintiff Christopher Johnson, a network engineer in the United States Air Force who was on assignment in Qatar, and then returned to her home located on McGuire Air Force Base. Once home, every part of her body hurt, and soon Tracey realized that the tips of two eye teeth were missing. The next day, she visited her dentist, Dr. Alina E. Lyons, who filed down her teeth and capped them with bonding material. Tracey was informed that she likely suffered

---

[2] The facts are based on the record developed at trial.

nerve damage and would need a root canal.[3] To this day, she still experiences sensitivity in her teeth.

The day following the accident, due to the pain in her neck, lower back, and arms, Tracey sought treatment from a physician on the base. The doctor prescribed valium, vicodin, and Tylenol; neck and hand braces; and physical therapy. To care for Tracey and assume responsibility for Tracey's two daughters, ages fifteen and thirteen, her parents flew in from Oregon. Additionally, Christopher was released from his duties in Qatar and, approximately one week later, returned home to care for his wife and their daughters.

A month later, still suffering persistent pain, Tracey underwent an MRI of her cervical spine, which revealed a herniated cervical disc at the C6–C7 level.[4] A pain management specialist administered steroid injections and acupuncture in the back of Tracey's neck to relieve inflammation and treat muscle spasms. Although those treatments decreased her neck pain, she continued to suffer "flair-ups" approximately twice a month.

Because the pain in her lower back did not abate, in May 2002, Tracey underwent another MRI, which revealed grade one spondylolisthesis[5] at L5–S1[6] and a small disc herniation. Trigger point injections in the lower back area proved to be unhelpful.

---

[3] As of the trial, Tracey had not had that dental procedure.

[4] The upper part of the spine is comprised of the seven cervical vertebrae, designated C1 to C7, located in the neck. *See Stedman's Medical Dictionary* A17–A18, 2118 (28th ed.2006). A hernia is a "[p]rotrusion of a part or structure through the tissues normally containing it." *Id.* at 879.

[5] Spondylolisthesis refers to the "[f]orward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or on the sacrum." *Stedman's, supra,* at 1813.

[6] The lumbar vertebrae, denoted L1 to L5, are located in the region of the back between the ribs and pelvis. *Id.* at A17–A18, 1121, 2118. Beneath the lumbar vertebrae are the sacral vertebrae, designated S1 to S5, which fuse to form the

An MRI administered in January 2003 disclosed that the spondylolisthesis remained grade one but that the herniated disc had enlarged. At that same time, without sedation, Tracey underwent a discogram, a painful procedure in which needles are inserted into the discs where dye is injected, permitting an x-ray assessment of any disc damage. That test revealed a herniated disc at L5–S1.

As a result of those tests, in May 2003, surgery was performed at the University of Pennsylvania Hospital to fuse together Tracey's L5 and S1 vertebrae. The procedure involved removing the disc from between the L5 and S1 vertebrae, placing bone from the pelvis into the disc space, and then inserting plates and screws to stabilize the vertebrae. The surgery left a four-and-one-half inch scar on Tracey's back.

The surgery was followed by a long and painful recovery period during which she was almost totally dependent on others for her basic needs. For at least three months, Tracey wore a fiberglass body brace that extended from just underneath her chest to her right thigh.[7] She was only permitted to take the brace off for thirty minutes each day to shower and move her bowels. While wearing the body brace, Tracey could not sit or bend, and ate while standing. Without assistance, she could not remove herself from bed. Both her mother and Christopher bathed her, and Christopher wiped her after bowel movements and shaved her legs. During the first week, she woke up every hour due to pain. On a scale of ten, Tracey described her pain level during the recovery period as a "ten."

Following removal of the body brace, Tracey engaged in very painful physical therapy until December 2003. She could not

---

sacrum. *See id.* at A17–A18, 2119. Below the sacrum is the coccyx, or tail bone. *Id.* at 403.

[7] Although plaintiffs' counsel and the trial court suggested that she wore the body brace for four months, Tracey's testimony indicated that she wore the brace for three months.

drive until the fall of that same year. Tracey described how the accident radically altered her lifestyle, from the mundane details of everyday life to the activities that gave her enjoyment. She is unable to do the same housework. She has given up gardening, a favorite pastime. She no longer goes hiking or camping, or jet skies, or rides roller coasters when the family visits an amusement park. She does not have the same level of intimacy with her husband, and in fact her marital relations had ceased for a time after the accident. Before the accident, she was "happy-go-lucky," and now she is angrier and less spontaneous. Although she is in less pain today than before her surgery, a day does not pass without her back aching, and the level of her pain has plateaued since the summer of 2004.

Tracey's medical history before the November 12, 2001 automobile accident became an issue at trial, particularly injuries she previously had suffered to her lower back. Most significantly, in 1991, after hurting her back from lifting a child, Tracey was diagnosed with grade one spondylolisthesis and a herniated disc at the L5–S1 level. In time, with physical therapy treatments, she "got better." Following a hysterectomy in 1993, she also experienced lower back pain and again, with physical therapy, reached the point where she was "fine." Finally, in 1997, after falling while rollerblading, and in 1998, after gardening, Tracey incurred pain to her lower back and knee.

At trial, the *de bene esse* deposition of Dr. David Lessing, plaintiff's board certified orthopedic surgeon, was introduced into evidence. While acknowledging Tracey's previous injuries, Dr. Lessing concluded that the trauma of the November 2001 accident aggravated and accelerated the deterioration of the disc herniation at L5–S1 and the spondylolisthesis, necessitating the fusion surgery.[8] Because of the surgery, Dr. Lessing noted that Tracey's

---

[8] Although Dr. Lessing admitted that Tracey's 1991 MRI "read almost identically" to her post-accident May 2002 MRI, he opined that the enlarged disc herniation revealed in the January 2003 MRI was a direct result of the accident.

back had undergone "massive permanent changes" that will place at risk adjacent discs, which in time will likely deteriorate, eventually herniate, and cause radicular (nerve root) pain. Overall, Dr. Lessing offered a "poor prognosis" for Tracey.

He also offered his expert opinion that the November 2001 accident caused the cervical disc herniation in Tracey's neck at C6–C7. Here too he gave a "poor prognosis," indicating that the injury to Tracey's neck is permanent, that she will continue to experience pain, and that now the cervical disc will deteriorate at a faster rate.

Dr. Irving Ratner, a board certified orthopedic surgeon, testified at trial for defendant. In studying the MRIs of Tracey's back, Dr. Ratner did not observe anything "pathologic." In his opinion, Tracey's back problems were not related to the accident, but rather to "preexisting degenerative changes that everyone of us gets along the way." In particular, he found that the radiologist had "overread and exaggerated" the disc herniation at C6–C7. He, moreover, believed that Tracey's grade one spondylolisthesis was no different than before the accident. His physical examination of Tracey revealed no residual defects to her neck or lower back from the accident itself, although he noted she had a limited range of motion caused by the surgery. He concluded that due to the "preexisting defect" to her lower back, "which was producing symptoms for at least 10 or 11 years before this accident," she eventually would have needed the fusion operation or a similar one, but that the accident "brought her to the operating room at a point in her life somewhat sooner."

### B.

In January 2003, plaintiffs Tracey and Christopher Johnson filed a civil complaint in the Superior Court, Law Division, alleging that defendant Scaccetti negligently caused the injuries Tracey sustained in the accident. Christopher asserted a claim for loss of consortium. To comply with AICRA, the plaintiffs filed a certification from Tracey's treating dentist, Dr. Alina Lyons, averring

that Tracey's "[t]eeth were chipped and/or contained fractures requiring enamoplasty & fluoride application; [two] teeth required root canal and caps." *See N.J.S.A.* 39:6A–8(a).[9] On the form certification, Dr. Lyons checked off the box for "[d]isplaced fracture(s)" to describe the injury to Tracey's teeth caused by the automobile accident.

In a four-day trial in January 2005, the case was presented to a jury. Before the case was submitted to the jury, however, the trial court ruled as a matter of law that Tracey's chipped teeth, which defendant stipulated were caused by the accident, constituted "displaced fractures." The court then held that plaintiffs had vaulted the limitation on lawsuit threshold, allowing the jury to consider all of Tracey's injuries proximately caused by the accident for the purpose of calculating pain and suffering damages. Although defendant objected to the finding that the chipped teeth were displaced fractures, he apparently accepted the assumption held by the court and plaintiffs that once the threshold was vaulted, Tracey's remaining injuries did not have to satisfy a threshold category.

The jury found defendant liable for causing the injuries Tracey sustained in the accident and awarded her pain and suffering damages in the amount of $2,500,000. The jury also awarded Christopher $500,000 for loss of consortium. The court denied defendant's new trial motion in which he argued again that chipped teeth did not meet AICRA's definition of displaced fractures. The court, however, determined that the jury's damages award was "grossly excessive" and therefore granted defendant's motion for remittitur, reducing Tracey's award to $1,500,000 and Christopher's to $250,000. Plaintiffs and defendant both appealed.

---

[9] *N.J.S.A.* 39:6A–8(a) provides that within sixty days "following the date of the answer to the complaint," a plaintiff must "provide the defendant with a certification" that states "that the plaintiff has sustained an injury [under the limitation on lawsuit threshold]." The physician issuing the certification must make his statement "under penalty of perjury," and must base his findings on "objective clinical evidence." *Ibid.*

## C.

In an unpublished, per curiam opinion, the Appellate Division affirmed the trial court's denial of defendant's motion for a new trial, finding that Tracey's chipped teeth met the definition of displaced fractures—fractures " 'involving a complete separation of bone.' " (quoting *DiProspero v. Penn,* 183 *N.J.* 477, 488, 874 *A.*2d 1039 (2005)). The panel also found that once a " 'singular injury,' " such as a displaced fracture, meets the tort threshold, the jury then may consider "claims for all injuries sustained in the accident whether or not they independently meet the threshold." (quoting *Puso v. Kenyon,* 272 *N.J.Super.* 280, 293, 639 *A.*2d 1120 (App.Div.1994)). At the appellate oral argument, defendant conceded that a single injury vaulting the threshold opened the door to the jury's consideration of pain and suffering damages for all other injuries. Even in the absence of the dental injuries, the panel held as a matter of law that "the proofs conclusively established that Tracey suffered an objective and permanent soft tissue spinal injury to meet the applicable AICRA threshold."

The panel rejected defendant's argument that, given Tracey's previous back problems, plaintiffs "failed to demonstrate, by an appropriate comparative analysis of objective medical evidence[ ], a causal relationship between the accident and her present condition." Last, the panel reversed the trial court's grant of remittitur. Although it considered the damages award to be "on the generous side," the panel maintained that "the jury's award was not so disproportionate to Tracey's injuries and resulting disabilities so as to be manifestly unjust."

We granted defendant's petition for certification. 188 *N.J.* 489, 909 *A.*2d 724 (2006). We also ordered the parties to submit supplemental briefs "on the issue of whether the establishment of a displaced fracture should enable a party to present proof on all other injuries regardless of whether they independently meet the threshold requirements." Additionally, we granted the motions of the New Jersey State Bar Association and the Association of Trial Lawyers of America–NJ to participate as *amici curiae.*

## II.

In this appeal, we must address three separate issues. We must decide (1) whether Tracey's chipped teeth may be considered "displaced fractures" under AICRA's lawsuit option, and if not, whether any of her other injuries meet the threshold standard; (2) whether a plaintiff who establishes a single bodily injury that meets AICRA's lawsuit threshold is entitled to have a jury consider all other injuries in calculating pain and suffering damages, regardless of whether the other injuries independently satisfy the threshold requirements; and (3) whether the trial court properly exercised its discretion in ordering a remittitur of the jury's award of damages.

The first two issues require us to construe once again the Automobile Insurance Cost Reduction Act, *L.* 1998, *c.* 21 (codified at *N.J.S.A.* 39:6A–1.1 to –35), the Legislature's most recent enactment implementing a scheme of no-fault automobile insurance. The history of this State's various legislative experiments with no-fault automobile insurance is dealt with extensively in *DiProspero, supra,* 183 *N.J.* at 485–89, 874 *A.*2d 1039 and *Caviglia v. Royal Tours of America,* 178 *N.J.* 460, 466–71, 842 *A.*2d 125 (2004), and need not be repeated here. It suffices to say that the primary aim of the various no-fault statutory schemes has been to achieve "lower premiums and prompt payment of medical expenses" by restricting the insured's unlimited right to sue for noneconomic damages for injuries suffered in an automobile accident. *See DiProspero, supra,* 183 *N.J.* at 485, 874 *A.*2d 1039 (citations and internal quotation marks omitted).

AICRA was intended to reform the automobile tort system by, among other things, containing spiraling medical costs and insurance premiums. *Id.* at 488, 874 *A.*2d 1039. As part of that reform plan, the Legislature created a new lawsuit threshold, reconfiguring the prior lawsuit threshold's nine categories into six. *Ibid.* (citing *N.J.S.A.* 39:6A–8(a)). The present limitation on lawsuit threshold bars a recovery for pain and suffering unless the plaintiff "has sustained *a* bodily injury which results" in (1)

"death"; (2) "dismemberment"; (3) "significant disfigurement or significant scarring"; (4) *"displaced fractures"*; (5) "loss of a fetus"; or (6) "a permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement." *N.J.S.A.* 39:6A–8(a) (emphasis added). The statute explains that "[a]n injury shall be considered permanent when the body part or organ, or both, has not healed to function normally and will not heal to function normally with further medical treatment." *Ibid.*

In purchasing their automobile insurance policy, the Johnsons elected the limitation on lawsuit option. We therefore must first determine whether the chipped teeth sustained by Tracey in the accident constitute "displaced fractures," allowing her to vault the threshold and recover noneconomic damages.

## III.

### A.

■ *N.J.S.A.* 39:6A–8(a) does not define "displaced fractures." Our mission therefore is one of statutory interpretation, divining the meaning of "displaced fractures" in AICRA's limitation on lawsuit threshold. Our task when interpreting a statute is simply to carry out the Legislature's intent. *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039. In doing so, we begin with the language of the statute, ascribing to the words "their ordinary meaning and significance." *Ibid.* (citing *Lane v. Holderman,* 23 *N.J.* 304, 313, 129 *A.*2d 8 (1957)). We do not believe that the meaning and significance of the term displaced fracture would be self-evident to a person without some medical understanding or training. When statutory words have a technical meaning or medical significance, we necessarily turn to authorities with expertise in such matters. *See N.J.S.A.* 1:1–1 ("Technical words and phrases, and words and phrases having a special or accepted meaning in the law, shall be construed in accordance with such technical or special and accepted meaning.").

■ The term displaced fracture has a common meaning within the medical community. Various medical dictionaries and reference books universally define or diagram a displaced fracture as a complete separation of a *bone* "where the two broken ends are no longer aligned properly." Johns Hopkins Medical Letter Health After 50, *Johns Hopkins Symptoms and Remedies: The Complete Home Medical Reference* 352 (Simeon Margolis ed., 1995); *see Columbia University College of Physicians and Surgeons Complete Home Medical Guide* 632 (Donald F. Tapley et al. eds., 3d rev. ed.1995) (diagramming completely separated and non-aligned bone); *Magill's Medical Guide* 871 (Tracy Irons–George ed., 2d rev. ed.2002) (same); *Stedman's Medical Dictionary* 769 (28th ed.2006) (same); *see also The Human Body: An Illustrated Guide to Its Structure, Function, and Disorders* 34 (Charles Clayman ed., 1995) (depicting "displaced bone" in discussion of fractures).

Non-medical reference texts as well define a displaced fracture as a type of broken bone. *See* 11 *Encyclopedia Americana* 686–87 (2004) ("A fracture is said to be displaced when the bone fragments have moved from their normal position."); *TheFreeDictionary, displaced fracture*, http://www.thefreedictionary.com/displaced20fracture (last visited July 20, 2007) (defining fracture as when two ends of broken bone are separated); *Word Web Online, displaced fracture*, http://www.wordwebonline.com/en/DISPLACEDFRACTURE (last visited July 20, 2007) (same).

Moreover, dental reference books do not refer to chipped or broken teeth as displaced fractures. *See, e.g.,* J.O. Andreasen & F.M. Andreasen, *Essentials of Traumatic Injuries to the Teeth* 29–62 (1990) (employing various terms to describe chipped teeth, including "crown fractures," "enamel fractures," and "infractions"); J.O. Andreasen & F.M. Andreasen, *Textbook and Color Atlas of Traumatic Injuries to the Teeth,* 219–311 (1994) (same); Louis H. Berman et al., *A Clinical Guide to Dental Traumatology* 27–50 (2007) (same); Ivor Chestnutt & John Gibson, *Churchill's Pocketbook of Clinical Dentistry* 161–62 (2d ed.2002) (same); M.S.

Duggal et al., *Handbook of Dental Trauma: A Practical Guide to the Treatment of Trauma to the Teeth* 35–66 (M.E.J. Curzon ed., 1999) (same). That is likely because bone and teeth are distinctly different anatomically and in function.

Bone is a "[a] hard connective tissue consisting of cells embedded in a matrix of mineralized ground substance and collagen fibers." *Stedman's, supra,* at 240. The more than two hundred bones of the adult body protect organs from injury and generally store such vital elements as blood, blood cells, bone cells, calcium, and bone marrow. Johns Hopkins University, *Johns Hopkins Family Health Book* 629 (1st ed.1999). On the other hand, a tooth is "[o]ne of the hard conic structures set in the alveoli of the upper and lower jaws, used in mastication and assisting in articulation." *Ibid.* Teeth are composed primarily of enamel and dentin. *Ibid.*

In *DiProspero,* we clearly understood "displaced fractures" to refer to broken bones. In explaining the differences between AICRA's limitation on lawsuit threshold and its predecessor statute, we noted that "[w]hile any fracture vaulted the [prior statutory] threshold, AICRA limited that category to displaced fractures, a more serious type of fracture involving a complete separation of a broken *bone.*" *DiProspero, supra,* 183 *N.J.* at 488, 874 *A.*2d 1039 (emphasis added). We also acknowledged that of all the threshold categories in *N.J.S.A.* 39:6A–8(a), "[o]nly a displaced fracture could possibly qualify as a non-permanent injury, provided the fracture could heal well enough for the *bone* to function normally." *Id.* at 497, 874 *A.*2d 1039 (emphasis added).

Thus, the uniform authority as reflected in medical and dental texts, non-medical reference books, and our case law leaves little doubt that the "ordinary meaning and significance" of a displaced fracture is the complete separation of a bone. We cannot accept plaintiffs' argument that a minimally, or even substantially, chipped tooth is a sufficient basis for vaulting the limitation on lawsuit threshold. Nor do we give weight to the form certification completed by Tracey's dentist, who merely checked off a box for

"[d]isplaced fracture(s)" without giving any support for her opinion. We therefore conclude that the Legislature did not intend chipped teeth to fall into the category of "displaced fractures" under *N.J.S.A.* 39:6A–8(a).[10]

## B.

The trial court did not instruct the jury to find whether any of Tracey's remaining injuries vaulted the threshold. In light of our holding that chipped teeth are not "displaced fractures" for AICRA purposes, the liability verdict can stand only if, as a matter of law, plaintiffs proved an injury vaulting the lawsuit threshold. The Appellate Division concluded as a matter of law that Tracey suffered a permanent injury to her back that met AICRA's lawsuit threshold. We agree with the Appellate Division that "the proofs conclusively established that Tracey suffered an objective and permanent soft tissue spinal injury to meet the applicable AICRA threshold."

In rendering its verdict, the jury specifically found that the November 2001 accident proximately caused Tracey's back injuries, which in turn led to the vertebra-fusion operation and a three or four month period during which she was confined to a body cast. The major point of contest between the parties was causation. The jury rejected defendant's argument that Tracey's back condition, medical treatments, and operation were the result of pre-existing injuries. The liability verdict and the size of the damages award supports the conclusion that the jury considered the injuries to be permanent. *See N.J.S.A.* 39:6A–8(a) (stating that permanent injury is one that "has not healed to function normally and will not heal to function normally with further

---

[10] We need not decide here whether, in an appropriate case, a dental injury could constitute a "permanent injury" or "significant disfigurement" under *N.J.S.A.* 39:6A–8(a). *Cf. Owens v. City of Detroit,* 163 *Mich.App.* 134, 413 *N.W.*2d 679, 682 (1987) (holding that loss of teeth requiring plate that occasionally fell out of mouth created jury question on issue of "permanent, serious disfigurement").

medical treatment"). The trial court, moreover, described Tracey's injuries as "permanent in nature" and "life altering." The record leaves little doubt that the back injuries found by the jury to be proximately caused by the accident also meet the standard for permanent injuries under the lawsuit threshold, notwithstanding that the jury did not render a verdict on this precise issue.[11]

## IV.

### A.

This Court requested supplemental briefing to address whether, for the purpose of recovering noneconomic damages, a single injury satisfying a threshold category opens the door to consideration of all other injuries regardless of whether they independently meet the threshold requirements. At issue is the correctness of *Puso v. Kenyon,* 272 *N.J.Super.* 280, 293, 639 *A.*2d 1120 (App.Div.1994), a pre-AICRA case, which held that "a singular injury meeting the tort threshold will permit a claimant to sue for noneconomic loss causally related to all injuries sustained in an automobile accident."

Having determined that Tracey had vaulted the lawsuit threshold by proving "displaced fractures," both the trial court and appellate panel in this case relied on the logic of the *Puso* decision to conclude that the jury was entitled to assess all of Tracey's injuries in calculating pain and suffering damages.[12] Our ruling

---

[11] We recognize that a physician's certificate attesting that a plaintiff has suffered a threshold injury is required by *N.J.S.A.* 39:6A–8(a). Although plaintiffs filed such a certification for Tracey's chipped teeth, none was filed for her back injuries, presumably because plaintiffs acted under the belief, as did the trial court and the Appellate Division, that chipped teeth satisfied a threshold category. We could remand this case for a new trial requiring plaintiffs to file such a certification, but we conclude that would not be in the interest of justice under the circumstances. Plaintiffs' expert testified at a deposition, and defendant claimed no surprise at trial. It would be a waste of judicial resources to retry a case when a full record was developed and defendant received a fair trial.

[12] Defendant did not challenge the validity of the *Puso* decision either at trial or before the Appellate Division.

that Tracey's chipped teeth are not "displaced fractures" under AICRA, does not render moot the *Puso* issue. That follows because as a matter of law we have found that plaintiffs conclusively proved a permanent back injury, which, if *Puso* is good law, permitted the jury to consider all of the non-threshold-vaulting injuries, such as Tracey's chipped teeth, in calculating noneconomic damages. Even if the *Puso* issue were moot, it is certain to arise many more times again and is of such general public importance that we will now address the arguments before us.

Defendant contends that allowing a plaintiff to present proof of injuries that do not independently vault the threshold would "fly in the face of the history of New Jersey's efforts to restrict the number of personal injury lawsuits" and thereby reduce the cost of automobile insurance. Plaintiffs and *amici curiae* respond that the language of *N.J.S.A.* 39:6A–8(a) only requires that an injured party subject to the lawsuit threshold sustain "*a* bodily injury" in one of the threshold categories to qualify for noneconomic damages resulting from all injuries. They argue that the current statutory language at issue essentially remains unchanged from the pre-AICRA verbal threshold and that it is fair to conclude that the Legislature has acquiesced in *Puso's* construction of *N.J.S.A.* 39:6A–8(a). Last, they submit that AICRA, as a whole, contained burgeoning insurance costs in a variety of different ways and was not intended to eliminate the right of an accident victim, even one subject to the threshold, to fair compensation for her injuries.

B.

As always, our inquiry first focuses on the plain language of the statute. "It is not the function of this Court to 'rewrite a plainly-written enactment of the Legislature [ ]or presume that the Legislature intended something other than that expressed by way of the plain language.'" *DiProspero, supra,* 183 *N.J.* at 492, 874 *A.*2d 1039 (alteration in original) (quoting *O'Connell v. State,* 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002)). Only if the statutory language is ambiguous should the court "'resort to extrinsic

interpretative aids,' " such as legislative history, canons of construction, or the policy considerations behind the legislation. *Id.* at 492–93, 795 *A.*2d 857 (quoting *Lozano v. Frank DeLuca Const.,* 178 *N.J.* 513, 522, 842 *A.*2d 156 (2004)).

*N.J.S.A.* 39:6A–8(a) provides that a tortfeasor is "exempted from tort liability for noneconomic loss to a person who is subject to" the limitation on lawsuit threshold "unless that person has sustained *a* bodily injury which results in death; dismemberment; significant disfigurement or significant scarring; displaced fractures; loss of a fetus; or a permanent injury within a reasonable degree of medical probability, other than scarring or disfigurement." (Emphasis added).

"The common meaning of 'a' is one." *Fin. Servs., L.L.C. v. Zoning Bd. of Adjustment of Little Ferry,* 326 *N.J.Super.* 265, 274, 741 *A.*2d 121 (App.Div.1999); *see Webster's Unabridged Dictionary of the English Language* 1 (2d ed.2001) (defining "a" as "one" when "used before a noun expressing quantity"). Although we find somewhat persuasive the court's reasoning in *Puso, supra,* that the word "a" indicates a legislative intent that a single bodily injury suffices for vaulting the threshold for all injuries, 272 *N.J.Super.* at 293, 639 *A.*2d 1120, we cannot say that the statutory language is wholly unambiguous. Another fair reading might be that a plaintiff who proves "a bodily injury" that results in "significant scarring," for example, is entitled to pain and suffering damages only for that injury and not for other injuries that do not independently meet the threshold requirements. In view of the ambiguity in the statutory language, we now turn to extrinsic aids to assist in our understanding of the Legislature's intent. *See DiProspero, supra,* 183 *N.J.* at 492–93, 874 *A.*2d 1039.

C.

■ A well-established canon of statutory interpretation is that the Legislature "is presumed to be aware of judicial construction of its enactments." *Id.* at 494, 874 *A.*2d 1039 (citation and internal quotation marks omitted). *Puso* construed language in the pre-

AICRA no-fault statute, which is almost identical to the language in the current version of *N.J.S.A.* 39:6A–8(a). The 1988 pre-AICRA statute barred those subject to the threshold from suing for noneconomic damages "unless that person has sustained a *personal* injury which results in" an injury fitting into one of nine categories. *L.* 1988, *c.* 119, § 6 (emphasis added). The current statute bars a right to sue "unless that person has sustained a *bodily* injury which results in" an injury fitting into one of six categories. *N.J.S.A.* 39:6A–8(a) (emphasis added). We do not see any meaningful distinction between those two clauses, despite the change in adjectives from "personal" to "bodily" preceding "injury."

As noted earlier, in 1994 the Appellate Division held that a single injury satisfying a threshold category allows the jury to consider all injuries in calculating pain and suffering damages. *Puso, supra,* 272 *N.J.Super.* at 293, 639 *A.*2d 1120. We must presume that the Legislature was aware of the judicial construction of its pre-AICRA statute and that by using virtually the same language in AICRA—and not amending the statute—the Legislature was acquiescing in, if not adopting, *Puso's* declaration of its intent. *See Quaremba v. Allan,* 67 *N.J.* 1, 14, 334 *A.*2d 321 (1975) (stating that " 'continued use of the same language or failure to amend the statute, is evidence that [a judicial] construction is in accord with the legislative intent' " (quoting *In re Keogh–Dwyer,* 45 *N.J.* 117, 120, 211 *A.*2d 778 (1965))).

The courts of our State have been guided by *Puso* for thirteen years in dealing with countless cases. We hardly need state that the Legislature knows how to express its disagreement with case law by amending a statute if it believes a court has misconstrued its intent. *See, e.g., Maressa v. New Jersey Monthly,* 89 *N.J.* 176, 185–87, 445 *A.*2d 376 (observing that Legislature twice amended reporter's Shield Law in response to rulings by this Court and Appellate Division), *cert. denied,* 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982). The Legislature had the opportunity to eliminate *Puso's* construction of its no-fault law by amending the

cited language in *N.J.S.A.* 39:6A–8(a) when it passed AICRA, but it did not do so. In contrast, the Legislature made substantial changes to other provisions in *N.J.S.A.* 39:6A–8(a), indicating that its failure to override *Puso* was probably purposeful.

In short, we find that the Legislature's apparent acceptance of the *Puso* decision is a strong indication of its intention to retain the *Puso* interpretation. *See Quaremba, supra,* 67 *N.J.* at 14, 334 *A.*2d 321.

### D.

We also reject defendant's policy argument that allowing a plaintiff to collect noneconomic damages for all injuries proximately caused by an automobile accident when only a single injury satisfies a threshold category will frustrate the cost-cutting goals animating AICRA. While AICRA's legislative history suggests that a key goal was to reduce the cost of auto insurance, the Legislature balanced that objective with other concerns, such as preserving a plaintiff's right to sue. *See Serrano v. Serrano,* 183 *N.J.* 508, 517–18, 874 *A.*2d 1058 (2005). As we observed in *DiProspero, supra:*

> The new limitation on lawsuit threshold was but one means of stabilizing and reducing costs. The Legislature could have completely eliminated the right to sue for pain and suffering, which would have presumably reduced insurance premiums. But it did not do so. Instead, the Legislature chose to effectuate cost-cutting savings by placing specific restrictions on the right to sue.
>
> [183 *N.J.* at 505, 874 *A.*2d 1039.]

Significantly, it is far from certain that limiting a plaintiff's right to recover pain and suffering damages, as proposed by defendant, would actually decrease insurance costs. Rather, it is more likely that defendant's proposal would produce more litigation and perhaps an unmanageable scheme to administer. If, for example, a plaintiff sustained a fracture of the humerus—the bone in the arm running from the shoulder to the elbow—and a torn rotator cuff in a car accident, she might present evidence that the fracture is displaced and the torn rotator cuff a permanent injury. But if the jury determined that only the humerus injury met the AICRA

threshold, it might be near impossible for a jury to parse the pain and suffering stemming from the arm injury and that stemming from the shoulder injury. The same parsing would be necessary if among multiple herniated discs in the back proximately caused by an automobile accident only one constituted a permanent injury. Requiring such fine distinctions in sorting out the precise source of pain and suffering would inevitably lead to more appeals and higher costs.

It is worth mentioning that in the thirteen years since the *Puso* decision, we have not discerned a clamor about its holding. Defendant did not challenge *Puso* in the trial court or Appellate Division and did not petition this Court to review that case. We requested review of *Puso* on our own initiative and ordered supplemental briefing. Having completed that review, we are persuaded that *Puso* was soundly decided.

 We therefore hold that if a plaintiff establishes that one of her injuries satisfies the lawsuit threshold, she is entitled to have the jury consider in calculating noneconomic damages all of her injuries proximately caused by the automobile accident, regardless of whether any independently vaulted the threshold.

## V.

### A.

 Next, we must determine whether the trial court erred in granting the remittitur. We begin with first principles—a civil plaintiff has a constitutional right to have a jury decide the merits and worth of her case. *See N.J. Const.* art. I, ¶ 9 ("The right of trial by jury shall remain inviolate."). Our civil system of justice places trust in ordinary men and women of varying experiences and backgrounds, who serve as jurors, to render judgments concerning liability and damages. Determining just compensation for an accident victim, particularly when the damages are not susceptible to scientific precision, as in the case of pain and suffering damages, necessarily requires a high degree of discre-

tion. That is so because there is no neat formula for translating pain and suffering into monetary compensation. Although the "measure of damages is what a reasonable person would consider to be adequate and just under all the circumstances," *Model Jury Charges (Civil), Damages–Personal Injuries: Disability, Impairment, Loss of the Enjoyment of Life, Pain and Suffering* § 6.11F (Dec.1996), reasonable people may differ on what is fair compensation in any particular case. The "reasonable person" standard, however objective it might be, can be illusory. Our model jury instructions on pain and suffering recognize the inherently subjective nature of the damage-calculating process. Those instructions inform jurors that:

> The law does not provide you with any table, schedule or formula by which a person's pain and suffering disability, loss of enjoyment of life may be measured in terms of money. The amount is left to your sound discretion. . . . You each know from your common experience the nature of pain and suffering, disability, impairment and loss of enjoyment of life and you also know the nature and function of money. The task of equating the two so as to arrive at a fair and reasonable award of damages requires a high order of human judgment. For this reason, the law can provide no better yardstick for your guidance than your own impartial judgment and experience.
>
> [*Ibid.*]

Accordingly, juries must be given wide latitude in which to operate. *See Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 598, 379 *A.*2d 225 (1977). Only if it " 'clearly and convincingly appears' " that a damages award is so excessive that it constitutes "a miscarriage of justice" is a court empowered to overthrow the jury's verdict and grant a new trial. *Id.* at 596, 379 *A.*2d 225 (quoting *R.* 4:49–1(a)). Alternatively, in such circumstances, courts also are authorized to reduce or remit the damages.

### B.

The use of remittitur is encouraged whenever possible to avoid the "unnecessary expense and delay of a new trial." *Fertile v. St. Michael's Med. Ctr.,* 169 *N.J.* 481, 492, 779 *A.*2d 1078 (2001); *see also Baxter, supra,* 74 *N.J.* at 595, 379 *A.*2d 225. Accordingly, when a defendant moves for a new trial, successfully

claiming that a jury awarded excessive damages, the trial court has the option of denying the motion on the condition that the plaintiff consent to the reduction of "the award to a specified amount." *Fertile, supra,* 169 *N.J.* at 491, 779 *A.*2d 1078. In the absence of consent, a new damages trial is ordered. *See ibid.*

Because a jury is given wide latitude in determining pain and suffering damages, the standard for granting a new trial or remittitur is necessarily high. The " 'judge may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion; he is not a thirteenth and decisive juror.' " *Baxter, supra,* 74 *N.J.* at 598, 379 *A.*2d 225 (quoting *Dolson v. Anastasia,* 55 *N.J.* 2, 6, 258 *A.*2d 706 (1969)). A trial court should not order a new trial or remit a jury's damages award unless it is so clearly disproportionate to the injury and its sequela (here plaintiff's pain and suffering and loss of enjoyment of life) that it may be said to shock the judicial conscience. *See id.* at 604, 379 *A.*2d 225. The verdict must be " 'wide of the mark' " and pervaded by a sense of " 'wrongness.' " *Id.* at 598–99, 379 *A.*2d 225 (quoting *State v. Johnson,* 42 *N.J.* 146, 162, 199 *A.*2d 809 (1964)). In other words, the trial court must be "clearly and convincingly" persuaded that it would be manifestly unjust to sustain the award. *See R.* 4:49–1(a); *Baxter, supra,* 74 *N.J.* at 604, 379 *A.*2d 225.

In deciding whether to grant a remittitur, the court must accept the evidence in the light most favorable to the plaintiff, *Taweel v. Starn's Shoprite Supermarket,* 58 *N.J.* 227, 236, 276 *A.*2d 861 (1971), *overruled on other grounds by Fertile, supra,* 169 *N.J.* 481, 779 *A.*2d 1078, and must articulate its reasons for reducing a damages award by reference to the trial record. *See Baxter, supra,* 74 *N.J.* at 597–98, 379 *A.*2d 225. Although the court may rely on its knowledge of other injury verdicts, *Fertile, supra,* 169 *N.J.* at 500–01, 779 *A.*2d 1078, if it does so, it must give a factual analysis of how the award is different or similar to others to which it is compared.

On appeal, the standard of review for determining the excessiveness of a damages award is the same standard applicable to the trial court, *see Baxter, supra,* 74 *N.J.* at 596, 379 *A.*2d 225, with one significant exception. An appellate court must pay deference to the trial court's " 'feel of the case,' " given that, on appeal, review is confined to "the cold record." *Id.* at 600, 379 *A.*2d 225. However, "[t]he 'feel of the case' factor, while entitled to deference, is the only element distinguishing the standard governing appellate review from that controlling trial court reaction to a jury verdict." *Ibid.*

## C.

With those principles in mind, we turn to the trial court's stated reasons for remitting the verdict. The court considered the $2,500,000 award of pain and suffering damages to Tracey "vastly out of proportion to the impact upon her lifestyle." That conclusion, however, is seemingly belied by the court's factual findings.

With reference to the trial record, the court found that Tracey "endure[d] a body cast for four months"; "the injuries sustained by [her] have been life altering"; that "[s]he caters to the pain and discomfort that is now part of her daily routine"; that "the pain she now endures, as a woman in her early forties, is permanent in nature and it is likely to become more severe over time"; that "[h]er ability to see herself as a vibrant woman, who can keep pace with her active husband, has been snuffed out by this accident"; that it is "medically unrealistic" that she will be able to "enjoy an active lifestyle with her husband and her family"; that her "sexual relations have been diminished"; that her husband has been deprived "of the joys of his wife's companionship"; that her "pain has become a concern and worrisome burden to her husband"; that over "the course of [the] next three decades, there will be countless moments of laughter and thrills which will be held at bay by the decomposition of [Tracey's] spine"; and that those "lost opportunities for happiness ... cannot be logged or calculated."

In the court's analysis, those factual findings were overcome by the following factors—factors which are of questionable relevance. The court initially noted that the verdict "may very well be one of the highest verdicts, if not the highest verdict ever rendered here in Burlington County." The court, however, did not compare the facts of this case to others that it had in mind. Therefore, it is impossible to know if there is any relevance to the court's comments.

The court also commented that the jury was not asked to consider any wage loss. We do not see how that can be a relevant consideration in a claim for noneconomic damages. Additionally, the court gave weight to Tracey's physical presence at trial. The court observed that "there was no appearance of any great physical disability," and that Tracey had no difficulty sitting and walking. While those "feel of the case" observations are entitled to some deference, they do conflict with the court's myriad findings concerning Tracey's existence outside of the courtroom, which the court described as one of "constant pain which limits her ability to engage in her previously active lifestyle."

Here, the trial court acknowledged that the jury acted in good faith and that "the verdict was [not] tainted by sympathy or prejudice." It is equally clear that the trial court proceeded in good faith, grappling with a difficult and close issue. The jury's award is undoubtedly high, perhaps overly generous. Nonetheless, the trial court failed to articulate sufficient reasons to justify a remittitur, which we have said is reserved to correct only a "manifest miscarriage of justice." *Baxter, supra,* 74 *N.J.* at 598, 379 *A.*2d 225. In a close case, the tie must go to the jury. *See ibid.* ("In the American system of justice the presumption of correctness of a verdict by a jury has behind it the wisdom of centuries of common law merged into our constitutional framework."). Like the Appellate Division, we cannot conclude that the award of damages to Tracey and Christopher is so grossly excessive that it shocks the conscience.

For these reasons, we affirm the decision of the Appellate Division and reinstate the jury's award of damages.

## VI.

Last, we find without merit defendant's argument that plaintiffs' expert did not conduct a comparative analysis of her current injury to pre-existing injuries. Plaintiffs' expert addressed both the current and pre-existing injuries. Additionally, as we recently held, plaintiffs have no obligation to perform such a comparative analysis when they do not claim aggravation of a pre-existing injury. *Davidson v. Slater,* 189 *N.J.* 166, 186, 914 *A.*2d 282 (2007) (holding that plaintiff need not produce comparative analysis in non-aggravation-pled case).

## VII.

In summary, we disagree with the Appellate Division and now hold that chipped teeth do not qualify as "displaced fractures" under AICRA. We affirm all of the other findings of the Appellate Division: (1) the proofs established at trial that Tracey Johnson suffered a permanent injury, entitling her to recovery of noneconomic damages; (2) having established that one of her injuries met the AICRA threshold requirements, Tracey was entitled to seek noneconomic damages for all of her injuries proximately caused by the automobile accident, regardless of whether those injuries independently meet any of the threshold requirements; (3) the jury verdict was not so excessive that it shocks the conscience, and therefore the jury's award of damages must be reinstated.

The judgment of the Appellate Division is modified and affirmed, and the matter is remanded to the trial court for proceedings consistent with this opinion.

*For modification and remandment*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.