**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5082-16T3

CRAIG HELFGOTT,

    Plaintiff-Appellant,

v.

JOSEPH KONOPKA FUNERAL HOME,
LLC, and MANK REALTY, LLC,

    Defendants-Respondents.

_____

Argued May 22, 2018 — Decided July 9, 2018

Before Judges Yannotti and Mawla.

On appeal from Superior Court of New Jersey,
Law Division, Bergen County, Docket No.
L-5346-15.

Gregg Alan Stone argued the cause for
appellant (Kirsch, Gelband & Stone, PA,
attorneys; Gregg Alan Stone, of counsel and
on the brief; Ronald J. Morgan, on the brief).

Clifford J. Giantonio argued the cause for
respondents (Law Offices of Viscomi & Lyons,
attorneys; Clifford J. Giantonio, of counsel
and on the brief).

PER CURIAM

Plaintiff Craig Helfgott appeals from an order of judgment entered by the trial court on June 6, 2017, and an order dated July 7, 2017, which denied his motion for a new trial or, alternatively, for additur. We affirm.

I.

Plaintiff filed a complaint against Joseph Konopka Funeral Home, LLC (JKFH), alleging that on January 10, 2014, he suffered severe and permanent injuries when he slipped and fell on the sidewalk abutting certain property on Palisade Avenue in North Bergen. Plaintiff later filed an amended complaint, naming Mank Realty, LLC (Mank) as an additional defendant. Plaintiff alleged that JKFH and Mank (collectively, defendants) were negligent in failing to inspect and maintain the subject sidewalk free of any dangerous conditions, including accumulated snow and ice.

At trial, plaintiff testified that on January 10, 2014, while walking on the sidewalk adjacent to the JFKH property, he slipped and fell on the icy pavement and injured his ankle. Police responded to the scene, and plaintiff was transported to a medical center. The following day, plaintiff underwent surgical open reduction with internal fixation to his right ankle. The surgeon inserted an eight-hole metal plate with eight screws. Plaintiff was thirty-six years old at the time.

Plaintiff remained at home and was non-weight bearing for about a month. In that time, plaintiff only took one prescribed medicine, Vicodin, for pain. Plaintiff remained out of work until mid-February 2014. He began physical therapy and continued to be non-weight bearing except during physical therapy. He was on crutches through February and March 2014.

In April 2014, plaintiff started to place weight on his injured ankle when he was not in physical therapy. Initially, plaintiff used a "walking boot," but he removed the boot when he went to sleep. He testified that he had pain while trying to sleep because he had to elevate his foot to keep it from swelling.

On March 28, 2014, plaintiff underwent a second surgical procedure to remove two screws from his ankle. After the second surgery, plaintiff was able to flex his foot. He had physical therapy three times a week for sessions that lasted an hour and a half. Plaintiff continued physical therapy until late May 2014. He also performed certain exercises at home.

Plaintiff testified that he had made "a decent recovery," but his ankle was not fully recovered. He "had a fair bit of flexibility back," but his ankle still got fatigued, and at those times, the ankle did not feel stable. He was still experiencing pain.

A-5082-16T3

Plaintiff said that in July 2014, members of his family noticed he had an irregular gait. His right foot was "lagging a little bit." After receiving an MRI, his doctor said his foot was "pronating," which is like "tilting." At the doctor's suggestion, plaintiff obtained orthotics, which are orthopedic inserts. At the time of trial, plaintiff was still using the orthotics.

Plaintiff described his complaints. He has regular stiffness in his ankle when he wakes up and at the end of the day. During the day, plaintiff's ankle stiffens up if he does not flex and exercise it regularly. Plaintiff said he is not able to walk as much as he used to, and if he walks a lot, his foot gets tired and starts to hurt.

Plaintiff admitted, however, that he did "a fair bit of walking" on a recent vacation. He told his doctor that during the vacation, he walked up to twelve miles each day, but had pain afterwards. During his deposition, plaintiff said he walked a "decent amount" on that trip.

Plaintiff also testified that he has difficulty running. Although his gait has evened out, his right foot lags when he attempts to run. Plaintiff told his doctor that after he runs, his ankle is sore. Plaintiff described the pain as a two out of ten, with one the lowest amount of pain and ten the highest.

  A-5082-16T3

Plaintiff stated that his ankle hurts a lot when he climbs steep hills, and he is not able to go hiking. Plaintiff said that after the screws were removed, he has not done any hiking. However, at his deposition, plaintiff testified about climbing in a hilly, wooded area, but he insisted he had not been talking about hiking.

Plaintiff testified that the physical therapy had helped, and by mid-May 2014, he had recovered to the extent expected. Plaintiff did not feel any pain while he was testifying, but he said he feels pain "underneath the ankle bone on the inside." At his deposition, plaintiff did not specifically identify the place where he feels pain.

Plaintiff testified that he feels pain generally in his ankle. He takes over-the-counter medication, specifically Advil, "maybe a couple [of] times a week," to help with the soreness. He stated that his ankle still is stiff and does not "flex up and down."

Plaintiff was asked the last time he saw a doctor for his ankle. He could not recall, but testified he saw a doctor in January 2015. He also testified he may have seen a doctor once since that time. According to plaintiff, the doctor told him he could not do anything more for him.

Dr. Sean Lager, an orthopedic surgeon, testified for plaintiff. Dr. Lager diagnosed plaintiff with: (1) status post-right ankle fracture of the lateral malleolus and dislocation; (2)

A-5082-16T3

status post-open reduction with internal fixation of the right lateral malleolus and syndesmosis; (3) status post-removal of the right ankle syndesmotic hardware; (4) posterior tibial tendinitis and pronation; and (5) injury to the peroneal tendon and deltoid ligament. Dr. Lager testified that plaintiff had suffered "a high energy injury." He said it was as though the "energy [had] exploded" and "a small bomb" had gone off. He stated that the bone that sits at the bottom of the ankle "slammed" into the tibia.

Dr. Lager further testified that in April 2015, plaintiff had an x-ray, which showed osteoarthritis in the ankle joint. The doctor stated that the arthritis would worsen as plaintiff ages. He opined to a reasonable degree of medical probability that plaintiff's injuries are permanent. He said plaintiff's future prognosis included three options: (1) an ankle fusion; (2) total ankle replacement; or (3) continued conservative treatment.

Dr. Lager acknowledged that when plaintiff returned to see him on February 26, 2014, he only had occasional soreness after therapy. Plaintiff reported that the pain was a one out of ten. Plaintiff also had some tenderness when his incision was touched.

Plaintiff returned to see Dr. Lager on May 27, 2014, and he was full weight-bearing. On July 8, 2014, plaintiff also was full weight-bearing, but he complained of some difficulty with running and stiffness. He said the pain in his ankle was a two out of ten.

6                                                       A-5082-16T3

The doctor recommended an anti-inflammatory, but he was unsure whether plaintiff followed his recommendation.

Dr. Lager noted that on July 29, 2014, plaintiff complained of right ankle pain, especially after a lot of activity. Plaintiff did not experience pain when the doctor pushed on the right deltoid ligament. According to the doctor, the deltoid ligament was stretched out and the ankle or foot was more pronated. The doctors recommended orthotics to balance the ankle so plaintiff would be anatomically correct while walking. Plaintiff obtained orthotics shortly thereafter.

Dr. Lager also discussed the report of plaintiff's physical examination, which another doctor performed on September 15, 2016. The report indicated that plaintiff had no swelling, bruising, asymmetries, or deformities in the ankle. The examination report indicated that plaintiff reported no pain to his ankle when it was pressed or squeezed. He had a full range of motion.

The examination report noted that plaintiff had taken an extended vacation, during which he walked up to twelve miles each day. Plaintiff reported he had pain afterwards, but at the time of the examination, he was pain-free. Plaintiff was diagnosed with a deltoid ligament sprain. Dr. Lager testified that this meant the ligament "likely healed in with some scar tissue," but he did not think it was functioning the way it was supposed to function.

A-5082-16T3

Dr. Lager noted that as of March 31, 2016, plaintiff was not taking any pain medications. Plaintiff reported pain, stiffness, and soreness. He was taking Advil, and said the pain was a one or two out of ten. In the report, the doctor wrote that plaintiff would probably never be one hundred percent, "but there is medical treatment he may be able to [have] in the future that could help with some of [his] symptomatology."

Defendants presented testimony from Dr. Charles Carozza, who is also an orthopedic surgeon. He testified that plaintiff had suffered a permanent injury, and the plate and the screws are permanently in plaintiff's ankle. Dr. Carozza said plaintiff's injuries had resulted in residual disability, meaning a functional impairment to the ankle that is "going to last."

Dr. Carozza performed a physical examination of plaintiff on May 31, 2016. He stated that plaintiff had no apparent distress, and he walked with a normal gait. The doctor said this was a good indication that plaintiff did not have any pain. He noted that plaintiff reported he occasionally feels some medial pain or palpation over a tendon, rather than the ankle itself. Dr. Carozza found that plaintiff had some discomfort in the posterior tibialis tendon.

Dr. Carozza also noted that he found plaintiff had no real discomfort over the medial or lateral operative site. The doctor

A-5082-16T3

did not feel any screw heads; they were buried in place. Plaintiff had full "dorsiflexion, which means he could cock his foot all the way back up." Plaintiff had full "plantarflexion," which means he "could put his foot down like a ballerina."

Plaintiff also had full "inversion" and "eversion." There was no pain on all range of motion. The doctor found no "ligamentous [in]stability," and he found no "effusion of the ankle," or "actual fluid in the joint." The doctor explained that effusion is an early sign of post-traumatic osteoarthritis.

Dr. Carozza opined that plaintiff did not suffer a tear of the peroneal tendon. In his examination, he saw no indication that plaintiff's deltoid ligament was attenuated or stretched. He testified that plaintiff had an excellent surgical procedure and an excellent result. Although he said plaintiff might develop osteoarthritis, Dr. Carozza saw no sign that plaintiff was developing that condition. Dr. Carozza noted that arthritis is not always caused by trauma.

Dr. Carozza further testified that plaintiff might not need fusion surgery. His condition could worsen, but he could also be healthy and have the same complaints he had at that time. There were no signs of a significant loss of motion, and the muscle tone was good. Plaintiff has flat feet, but "that's the way he's made."

A-5082-16T3

The doctor acknowledged that plaintiff had some scarring from the surgery, which was minor.

Dr. Carozza opined to a reasonable degree of medical certainty that plaintiff has some mild, subjective complaints. The only positive finding was an incision and some circumference enlargement of the ankle. He said plaintiff has reached maximum medical improvement from treatment, and further treatment is not necessary. He opined that plaintiff has a "minimal amount of residual disability."

The jury found that defendants were negligent and solely responsible for plaintiff's fall and his resulting injury. The jury awarded plaintiff $35,000 for pain and suffering, disability, impairment, and loss of the enjoyment of life. The trial judge molded the verdict to include the stipulated amount of plaintiff's medical expenses, which totaled $56,725.85.

Plaintiff thereafter filed a motion for a new trial or, in the alternative, additur. The trial judge denied the motion, and this appeal followed.

## II.

On appeal, plaintiff argues that the jury's award of $35,000 is grossly inadequate, shocks the conscience, and results in a miscarriage of justice. He further argues that the judge's decision denying his motion for a new trial was based on the judge's

mistaken belief that both medical experts did not find that he suffered a permanent injury. Plaintiff contends the trial judge should have granted his motion for a new trial or, in the alternative, additur. We disagree.

"A jury's verdict, including an award of damages, is cloaked with a 'presumption of correctness.'" Cuevas v. Wentworth Grp., 226 N.J. 480, 501 (2016) (quoting Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977)). That presumption is not overcome unless the party "clearly and convincingly" establishes that the award represents a "miscarriage of justice." Ibid. (quoting Baxter, 74 N.J. at 596); see also R. 4:49-1(a). Furthermore, in deciding whether to grant a motion for a new trial, the court must give "due regard to the opportunity of the jury to pass upon the credibility of the witnesses." Ibid. (quoting Ming Yu He v. Miller, 207 N.J. 230, 248 (2011)).

Moreover, a jury's damages award should not be overturned unless it "shock[s] the judicial conscience." Id. at 503 (quoting Johnson v. Scaccetti, 192 N.J. 256, 281 (2007)). An award meets that standard if it is "wide of the mark," "pervaded by a sense of wrongness," and is "manifestly unjust." Ibid. (quoting Johnson, 192 N.J. at 281). The standard is "objective in nature and transcends any individual judge's personal experiences." Ibid.

A-5082-16T3

It is well-established that in deciding a motion for a new trial under Rule 4:49-1(a), the judge

> may not substitute his judgment for that of the jury merely because he would have reached the opposite conclusion. . . . "[The trial judge must] canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict. . . ." [T]he trial judge takes into account, not only tangible factors relative to the proofs as shown by the record, but also appropriate matters of credibility, [which are] peculiarly within the jury's domain, so-called "demeanor evidence," and intangible "feel of the case" which [the judge] has gained by presiding over the trial.
>
> [Dolson v. Anastasia, 55 N.J. 2, 6 (1969).]

The standard of review for determining whether a damages award shocks the judicial conscience is the same for trial and appellate courts. Cuevas, 226 N.J. at 501. However, in reviewing the trial court's determination, "an appellate court must pay some deference to a trial judge's 'feel of the case.'" Ibid. (quoting Johnson, 192 N.J. at 282).

Here, the trial judge determined that the jury's verdict did not shock the judicial conscience and was not a miscarriage of justice. In the written statement appended to the order denying the motion for a new trial or additur, the judge wrote that the jury had the right to reject the credibility of any fact or expert

A-5082-16T3

witness and to accord the trial testimony whatever weight it deemed appropriate. The judge noted that his role was not to second-guess the jury's credibility assessments, or weigh the persuasiveness of the evidence, but rather to determine whether a reasonable jury could accept the evidence presented as support for its verdict. The judge found that there was no evidence the jury's verdict was the product of misunderstanding, bias, or prejudice.

The record supports the judge's determination that plaintiff did not meet the standard under Rule 4:49-1(a) for a new trial. He did not "clearly and convincingly" establish the damages award was "a miscarriage of justice." Ibid. Plaintiff notes that both medical experts testified that he has sustained a permanent injury. However, the experts disagreed regarding the impact of the injury.

As we have explained, Dr. Carozza testified that when he examined plaintiff, he found plaintiff had a normal gait. There were no lingering abnormalities with the ankle, which was a good indication plaintiff was not suffering any pain. According to Dr. Carozza, plaintiff had full range of motion with no pain. Plaintiff's expert, Dr. Lager, also testified that in September 2016, plaintiff had full range of motion. Plaintiff had some scarring from the surgery, but it was minor.

Furthermore, based on plaintiff's testimony, the jury could reasonably find that plaintiff did not have a substantial

A-5082-16T3

disability or impairment, and the injury did not have a substantial adverse impact on his ability to engage in his normal activities. Plaintiff initially denied that he could go hiking, but at his deposition, he testified about walking up hills. He also testified that after the accident, he went on an extended vacation during which he walked up to twelve miles each day.

The record therefore supports the trial judge's determination that the jury could reasonably find, based on the testimony presented and its assessment of the credibility of the witnesses, that a damages award of $35,000 was sufficient to compensate plaintiff for his pain and suffering, disability, impairment, and loss of the enjoyment of life.

The judge also correctly determined that because plaintiff did not meet the standard for a new trial under Rule 4:49-1(a), additur could not be considered. See Ming Yu He, 207 N.J. at 248; Caldwell v. Haynes, 136 N.J. 422, 443 (1994). See also Pressler & Verniero, Current N.J. Court Rules, cmt. 3 on R. 4:49-1(a) (2018) (noting that "neither additur nor remittitur can be ordered unless a new trial, at least on the damages issue, would be warranted").

Plaintiff argues that in denying his motion for a new trial, the judge erroneously stated that both medical experts had testified that his ankle repair was successful and caused no "lasting impact" upon him. Plaintiff correctly notes that both

medical experts testified that plaintiff had sustained an injury that was permanent. However, based on plaintiff's testimony and the testimony of both doctors, the jury could reasonably find that although the injury had a "lasting impact" upon plaintiff, the impact was minimal and warranted an award of $35,000 for pain and suffering, disability, impairment, and the loss of the enjoyment of life.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5082-16T3