SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**Division of Child Protection and Permanency v. D.C.A.** (A-44-22) (087604)

**Argued September 12, 2023 -- Decided November 16, 2023**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal, the Court determines whether trial courts may still consider the relationships between children and resource families under the fourth prong of the best interests of the child test, N.J.S.A. 30:4C-15.1(a)(4), despite a 2021 Amendment that precluded consideration of those relationships under the test's second prong, N.J.S.A. 30:4C-15.1(a)(2).

Defendants "Divina" and "Javier" are the parents of "Ignacio," born in 2015; "Josefina," born in 2016; "Antonia," born in 2019; and "Ian," born in 2020. The record reflects extensive evidence of domestic violence involving Divina and Javier. In July 2018, the trial court granted the Division of Child Protection and Permanency care, custody, and supervision of Ignacio and Josefina, citing concerns about continuing domestic violence, Divina's inability to provide a safe environment for the children, and Divina's mental health. Antonia and Ian were each removed from the home shortly after birth. Ignacio and Josefina were placed together in a resource home; Antonia and Ian were each placed in different resource homes.

The Division presented the testimony of its expert psychologist about the mental health of the parents and his bonding evaluations of the four children with Divina. In the case of each child, he found that the child had an "ambivalent and insecure" attachment to Divina and that the child did not have a "significant and positive bond" with her. The psychologist opined as to each child that there was a low risk that the child would suffer severe and enduring harm if the child's relationship with Divina were terminated. He also testified about the bonding evaluations that he conducted to assess the relationships between Antonia and Ian and their respective resource families, which had expressed the intent to adopt.

The Division next presented caseworker testimony. During cross-examination, the Law Guardian inquired how the children were doing in their current placements. Divina's counsel objected, arguing that in the wake of the 2021 Amendment to N.J.S.A. 30:4C-15.1(a), such evidence was no longer relevant.

1

The trial court overruled that objection, noting that the Legislature prohibited consideration of such evidence in the court's inquiry under the second prong of the best interests test, but not in the court's determination of the other prongs of the test. Ultimately, the trial court found that the Division had proven by clear and convincing evidence all four prongs of N.J.S.A. 30:4C-15.1(a) and terminated the parental rights of Divina and Javier to Ignacio, Josefina, Antonia, and Ian.

The Appellate Division affirmed, rejecting Divina's argument that the Legislature's amendment of N.J.S.A. 30:4C-15.1(a)(2) barred trial courts from considering evidence of the child's relationship with resource parents in any aspect of the termination of parental rights determination. 474 N.J. Super. 11, 24-30 (App. Div. 2022). The Court granted certification. 253 N.J. 599 (2023).

**HELD:** Based on the plain language of the 2021 Amendment, the Court concurs with the trial court and Appellate Division that the Legislature did not intend to bar trial courts from considering evidence of the child's relationship with the resource family when they address the fourth prong of N.J.S.A. 30:4C-15.1(a). The trial court properly considered the relationships between the children and their resource families when it considered the fourth prong of the best interests test, N.J.S.A. 30:4C-15.1(a)(4), and its determination as to all four prongs of that test was grounded in substantial and credible evidence in the record.

1. In New Jersey, the balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard. The Court reviews the history of the standard, which began as a generally phrased statute in 1951. The Court set forth a four-factor test to apply that statute in DYFS v. A.W., 103 N.J. 591, 604-11 (1986). In 1991, the Legislature enacted the original version of N.J.S.A. 30:4C-15.1(a), codifying in subsections (a)(1) through (a)(4) the four-prong test defined in A.W. The 1991 iteration of the termination of parental rights statute did not expressly direct courts to evaluate the child's relationship with the resource family as part of the best interests analysis. That specific direction was explicitly added to the second prong of the test -- N.J.S.A. 30:4C-15.1(a)(2) -- via legislative amendment in 1995 following the Court's recognition of the importance of that evaluation in In re Guardianship of J.C., 129 N.J. 1, 19 (1992). (pp. 20-24)

2. Although the relationship with the resource family was only explicitly added to the second prong of the best interests test as codified in statute, the Court explained that it was also relevant under the fourth prong -- N.J.S.A. 30:4C-15.1(a)(4) -- in In re Guardianship of K.H.O., 161 N.J. 337, 353-55 (1999), and subsequent case law. In short, by the time the Legislature amended N.J.S.A. 30:4C-15.1(a) in 2021, New Jersey courts had long considered a child's relationship with a resource family to be relevant not only when they assessed the evidence under the second prong of the best interests test, but also when they applied the fourth prong. (pp. 24-26)

2

3. In July 2021, the Legislature removed the instruction to consider the relationship with the resource family that had been added to N.J.S.A. 30:4C-15.1(a)(2) in 1995. A statement to the bill that proposed the amendment explained the legislation's intent to require the Division "to consider placement of children with relatives or kinship guardians" when determining the placement of children, and to change "certain standards for initiating petitions to terminate parental rights." The rest of N.J.S.A. 30:4C-15.1(a) was left unchanged. The fourth prong of the best interests test continues to require that a court determine whether "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). (pp. 26-29)

4. The Legislature made a single change to N.J.S.A. 30:4C-15.1(a) in 2021: the deletion of the sentence, "[s]uch harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child," from N.J.S.A. 30:4C-15.1(a)(2). It amended N.J.S.A. 30:4C-15.1(a)(2) to ensure that parental fitness -- not the child's bond with resource parents -- is the core inquiry when a judge considers the best interests standard's second prong in a termination of parental rights case. It did not identify as a legislative goal the elimination of that bond as a factor in any component of the best interests analysis. Indeed, as the Appellate Division noted, precluding the admission of all evidence concerning resource family placements could in some settings undermine the Legislature's objective to promote kinship caregivers and preserve family bonds. See 474 N.J. Super. at 25-26. In L. 2021, c. 154, which amended no fewer than eight statutes, the Legislature could easily have barred evidence of a child's relationship with resource parents in a court's inquiry under the fourth prong of the statutory standard, or entirely precluded consideration of such evidence in any aspect of a court's inquiry. The Court discerns no legislative intent for so fundamental a change and, were the Court to infer such intent absent a clear indication from the Legislature, it would undermine the State's parens patriae obligation to protect the welfare of children. The Court agrees with the Appellate Division's construction of the 2021 Amendment. (pp. 30-33)

5. And here, the trial court's detailed findings as to the best interests of Ignacio, Josefina, Antonia, and Ian are amply supported by substantial and credible evidence. The court's determination that the Division met its burden as to all four prongs of N.J.S.A. 30:4C-15.1(a) was a proper exercise of its broad discretion. (pp. 33-35)

   **AFFIRMED.**

**CHIEF JUSTICE RABNER and JUSTICES SOLOMON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE PATTERSON's opinion.**

3

# SUPREME COURT OF NEW JERSEY
## A-44 September Term 2022
## 087604

New Jersey Division of
Child Protection and
Permanency,

Plaintiff-Respondent,

v.

D.C.A.,

Defendant-Appellant,

and

J.J.C.B.,

Defendant.

_____

In the
Matter of the Guardianship of
I.A.C.C., J.S.C.C., A.I.C.C. and I.C.C.,

Minors-Respondents.

On certification to the Superior Court,
Appellate Division, whose opinion is reported at
474 N.J. Super. 11 (App. Div. 2022).

| Argued | Decided |
| --- | --- |
| September 12, 2023 | November 16, 2023 |

John A. Albright, Assistant Deputy Public Defender, argued the cause for appellant D.C.A. (Joseph E. Krakora, Public Defender, Office of Parental Representation, attorney; John A. Albright, of counsel and on the briefs).

Eleanor M. Armstrong, Assistant Attorney General, argued the cause for respondent New Jersey Division of Child Protection and Permanency (Matthew J. Platkin, Attorney General, attorney; Melissa H. Raksa and Sara M. Gregory, Assistant Attorneys General, of counsel, and Eleanor M. Armstrong and Mary L. Harpster, Deputy Attorney General, on the briefs).

Neha Gogate, Assistant Deputy Public Defender, argued the cause for minors I.A.C.C., J.S.C.C., A.I.C.C., and I.C.C. (Joseph E. Krakora, Public Defender, Office of the Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel, and Neha Gogate, of counsel and on the briefs).

Mary M. McManus-Smith argued the cause for amicus curiae Legal Services of New Jersey (Legal Services of New Jersey, attorneys; Mary M. McManus-Smith, Dawn K. Miller, Sylvia L. Thomas, Chiori Kaneko, Anne Gowen, and Jonnelle Casey, on the brief).

Randi Mandelbaum argued the cause for amici curiae Rutgers Child Advocacy Clinic and the Advocates for Children of New Jersey (Rutgers Law School Child Advocacy Clinic and Advocates for Children of New Jersey, attorneys; Randi Mandelbaum and Mary E. Coogan, on the brief).

JUSTICE PATTERSON delivered the opinion of the Court.

The Legislature has long mandated that in order for a Family Part judge to terminate parental rights, the New Jersey Division of Child Protection and Permanency (Division) must prove by clear and convincing evidence all four prongs of the "best interests" test set forth in N.J.S.A. 30:4C-15.1(a).  Two prongs of that standard are central to this appeal.  The second prong requires a court to decide whether "[t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm."  N.J.S.A. 30:4C-15.1(a)(2).  Under the fourth prong, a court determines whether "[t]ermination of parental rights will not do more harm than good."  N.J.S.A. 30:4C-15.1(a)(4).

From 1995 until 2021, the second prong of the standard provided that "[s]uch harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child."  N.J.S.A. 30:4C-15.1(a)(2) (1995).  In a July 2, 2021 amendment to N.J.S.A. 30:4C-15.1(a)(2) (the 2021 Amendment), the Legislature eliminated that language from the statutory standard.  L. 2021, c. 154.  The Legislature made no change to the fourth prong of the statute, N.J.S.A. 30:4C-15.1(a)(4).  See ibid.

3

In this appeal, we review the Appellate Division's decision affirming the trial court's termination of a mother's parental rights to four of her children. The trial court and the Appellate Division held that notwithstanding the Legislature's amendment of the second prong, a court may rely on evidence of harm that the child will suffer if separated from the resource family when it determines whether the Division has proven the fourth prong. DCPP v. D.C.A., 474 N.J. Super. 11, 24-30 (App. Div. 2022). The trial court found that the Division met its burden to prove all four prongs of the statute by clear and convincing evidence, and the Appellate Division affirmed that determination.

Based on the plain language of the 2021 Amendment, we concur with the trial court and Appellate Division that the Legislature did not intend to bar trial courts from considering evidence of the child's relationship with the resource family when they address the fourth prong of N.J.S.A. 30:4C-15.1(a). We agree with the Appellate Division that the trial court properly considered the relationships between the children and their resource families when it considered the fourth prong of the best interests test, N.J.S.A. 30:4C-15.1(a)(4), and that its determination as to all four prongs of that test was grounded in substantial and credible evidence in the record.

Accordingly, we affirm the Appellate Division's judgment.

I.

A.

Defendants D.C.A. (Divina) and J.J.C.B. (Javier) are the parents of I.A.C.C. (Ignacio), born in 2015; J.S.C.C. (Josefina), born in 2016; A.I.C.C. (Antonia), born in 2019; and I.C.C. (Ian), born in 2020.[1]  A fifth child, S.C.C., born in 2021, is the subject of a separate guardianship proceeding and is not involved in this appeal.

As the record before the trial court reflects, the Division presented extensive evidence of domestic violence involving Divina and Javier between 2015 and 2018, when they lived in New York, and additional incidents following their move to New Jersey in 2018.  The Division became involved with the family on July 5, 2018, when Divina complained to police that Javier was harassing her, resulting in Javier's arrest.  Divina told the Division that Javier had physically and sexually abused her on multiple occasions, but she declined to cooperate with the Division's efforts to ensure her family's safety and refused to provide the Division with information about her children.

---

[1]  In accordance with Rule 1:38-3(d)(12), and to protect the privacy of the family at issue in this appeal, we refer to defendants and the children by the pseudonyms used in the Appellate Division's opinion.  See D.C.A., 474 N.J. Super. at 15 n.1.

The Division conducted an emergency removal of Ignacio and Josefina. On July 9, 2018, citing concerns about continuing domestic violence, Divina's inability to provide a safe environment for the children, and Divina's mental health, the trial court granted the Division care, custody, and supervision of Ignacio and Josefina. The children were placed in a resource family home.[2]

The Division offered a range of services to Divina, referring her for psychiatric evaluations, psychological counseling, domestic violence counseling, parenting classes, and supervised visitation.[3] The Division also provided services to Javier. According to the trial testimony of Division caseworkers, the Division's initial goal was the reunification of the family. It

---

[2] A "resource family home" is a

> private residence wherein any child in the care, custody, or guardianship of the Department of Children and Families may be placed by the department, or with its approval, for care, and shall include any private residence maintained by persons with whom any child is placed by the division for the purposes of adoption until the adoption is finalized.
>
> [N.J.S.A. 30:4C-2(i).]

[3] According to the trial testimony of Division caseworkers, although most of Divina's visits with the children proceeded without incident, on one occasion Divina assaulted a Division staff member. She was then prohibited from entering the Division office and was denied access to Division staff unless police were present.

explored potential placements with relatives of Divina or Javier, including the children's maternal grandparents and Javier's adult children. The adult children were rejected because of Divina's dislike of them and incidents in their prior histories. The Division presented evidence at trial that despite its efforts, it was unable to identify any family member as a potential caregiver for the children.

Shortly after Antonia's birth, the Division conducted an emergency removal of the child. By order to show cause entered on April 16, 2019, the trial court granted to the Division care, custody, and supervision of Antonia. She was placed in a different resource home from the home in which Ignacio and Josefina had been placed.

In the months that followed Antonia's removal from Divina's and Javier's custody, the Division continued to offer services to the parents, and they participated in supervised visitation with all three children. However, the pattern of domestic violence continued. In July 2019, police were called to the family home four times in response to allegations of domestic violence by either Divina or Javier.

On September 25, 2019, citing the parents' failure to "make sufficient progress" and their mental health issues, the trial court entered a permanency order changing the permanency plan for Ignacio, Josefina, and Antonia from

7

reunification to termination of parental rights followed by adoption. The Division filed an order to show cause and complaint for guardianship on November 6, 2019, seeking to terminate the parental rights of Divina and Javier to Ignacio, Josefina, and Antonia. In February 2020, the Division transferred Ignacio and Josefina to a different resource family.

Immediately following the birth of Ian the same month, the Division conducted an emergency removal of the child. By Notice of Emergency Removal dated February 8, 2020, the trial court granted care, custody, and supervision of Ian to the Division. The Division initially placed Ian in the resource home where Ignacio and Josefina had been placed, but the trial court later reassigned him to a different resource home. On October 20, 2021, the trial court entered an order establishing termination of parental rights followed by adoption as a permanency plan for Ian.

According to the testimony of the Division caseworker who had primary responsibility for the family until a few weeks before trial, the Division determined that the second resource parents with whom Ignacio and Josefina were placed were not interested in adopting the children. The Division

8

therefore sought a selected adoptive home for the two children.[4]  As of the time of trial, the Division had identified a prospective adoptive family and the children were visiting the family's home on weekends in anticipation of a potential adoption.  Prior to trial, the Division advised the trial court that it anticipated that Antonia's resource parents would adopt her and that Ian's resource parents would adopt him in the event that the court were to terminate the parental rights of Divina and Javier.

B.

1.

The Division's guardianship action was tried before a Family Part judge over five days beginning on June 23, 2021, and concluding on September 22,

---

[4]  A "selected adoptive home" is "a resource family parent who has been licensed as a resource family home for the purpose of providing adoptive care to a child who does not currently reside with this resource family parent." N.J.A.C. 3A:11-1.3.  "Select home adoption" is "a process that includes looking for an adoptive home in New Jersey and registering the child on the national adoption exchange."  DYFS v. E.P., 196 N.J. 88, 98 (2008); see also Lynn V. Norcia, Adoption Through the Division of Child Protection and Placement, N.J. Lawyer (Dec. 2018), at 16-17 (noting that in a select home placement, "the placements are made solely with the intent of adoption, usually once the child is already legally free for adoption").

2021.[5]  The Law Guardian, representing the four children, supported the termination of the parental rights of Divina and Javier.

The Division presented the testimony of its expert psychologist, Alan J. Lee, Psy.D.  Dr. Lee testified that his provisional diagnosis of Divina was "unspecified schizophrenia spectrum and other psychotic disorder," "unspecified personality disorder with paranoid avoidant and borderline traits," and "a rule out diagnosis [of] post-traumatic stress disorder."  Dr. Lee stated that Divina's difficulty with impulse control, mood swings, behavioral changes, and inaccurate or inconsistent perception of reality were "likely to adversely impact her own functioning," and thereby her ability to consistently meet the needs of her children.  Moreover, Dr. Lee opined that Divina did not acknowledge any need for change in herself.  Dr. Lee also noted that Divina had provided him with information about her family that he knew to be

---

[5]  Over the three months during which the trial proceeded, Divina and Javier were involved in two more domestic violence incidents in which police were summoned to their home.  According to the trial testimony of a police officer, Divina admitted that during one of those incidents she had used a brick to smash the window and damage the fender of Javier's car, but she contended that she had the right to do so because the car belonged to her.

inaccurate, which he found "likely consistent with her difficulties accurately recognizing and reporting and acknowledging the problems in her life."[6]

Dr. Lee recounted his observations during his bonding evaluations of the four children with Divina. In the case of each child, he found that the child had an "ambivalent and insecure" attachment to Divina and that the child did not have a "significant and positive bond" with her. Dr. Lee opined as to each child that there was a low risk that the child would suffer severe and enduring harm if the child's relationship with Divina were terminated.

Dr. Lee also testified about the bonding evaluations that he conducted to assess the relationships between Antonia and Ian and their respective resource families, each of whom had expressed the intent to adopt. He opined that Antonia appeared happy in the presence of her resource parents, that she had a "significant and positive" bond with them after spending almost her entire life with them, and that the resource parents would likely be able to ameliorate any harm that Antonia would suffer were she to have no relationship with her birth parents. Dr. Lee offered his opinion that severing the bond between Antonia and her resource parents would cause severe and enduring harm to the child.

---

[6] Dr. Lee also testified about his mental health diagnoses of Javier, which are irrelevant to this appeal.

With respect to Ian, Dr. Lee testified that the child was developing a similar bond with his resource parents, that after a few more months there would be a risk of severe and enduring harm if that bond were to be severed, and that the resource parents would be expected to be able to ameliorate the harm if the child's relationship with his birth parents were to end.

Dr. Lee recommended "other permanency planning for the minor children besides reunification to [their] birth mother," and he advised against permitting Divina to have unsupervised visitation with the children.

The Division next presented the testimony of a caseworker supervisor and the former and current caseworkers assigned to work with Divina, Javier, and their children, as well as a police officer who had responded to domestic violence complaints involving the family.

During cross-examination of the former caseworker, the Law Guardian inquired how the children were doing in their current placements. Divina's counsel objected to testimony concerning the children's resource family placements, arguing that in the wake of the 2021 Amendment to N.J.S.A. 30:4C-15.1(a), such evidence was no longer relevant. The trial judge overruled that objection, noting that the Legislature prohibited consideration of such evidence in the court's inquiry under the second prong of the best interests test, but not in the court's determination of the other prongs of the

test.  The judge indicated that he would later decide what weight to give to the disputed testimony.

Neither Divina nor Javier testified at trial.  Divina presented the testimony of her expert, David Bogacki, Ph.D., ABPP.  Dr. Bogacki critiqued Dr. Lee's findings as to Divina's mental health and stated that he would not conclude based on those findings that Divina suffered from the mental health conditions that Dr. Lee diagnosed.

2.

In an oral decision on the record, the trial court found that the Division had proven by clear and convincing evidence all four prongs of N.J.S.A. 30:4C-15.1(a).  The court found the Division's witnesses to be credible, specifically noting the credibility of Dr. Lee's opinions based on the children's bonding evaluations.

The court found that the Division satisfied the first prong of the best interests test by virtue of clear and convincing evidence of the "toxic relationship" between Divina and Javier and the pattern of domestic violence continuing during trial that endangered the children's health, safety, and development.  See N.J.S.A. 30:4C-15.1(a)(1).

Addressing the second prong, N.J.S.A. 30:4C-15.1(a)(2), the trial court did not rely on evidence regarding the children's relationships with their

13

resource families. Instead, the court found that the Division had proven by clear and convincing evidence that Divina and Javier were unwilling or unable to eliminate the harm facing the children or to provide a safe and stable home, based upon Dr. Lee's opinion that neither could effectively parent, Divina's "outlandish" stories, and domestic violence episodes that continued unabated during trial.

As to the third prong, the trial court found that the Division had proven by clear and convincing evidence that it had made diligent efforts to provide numerous services to Divina and Javier and had considered alternatives to termination of parental rights. See N.J.S.A. 30:4C-15.1(a)(3).

Finally, the trial court determined that the Division had presented clear and convincing evidence that termination of parental rights would not do more harm than good, and that it had therefore met the requirements of N.J.S.A. 30:4C-15.1(a)(4). The trial court acknowledged the argument by Divina and Javier that the 2021 Amendment to N.J.S.A. 30:4C-15.1(a) barred all evidence of the children's relationships with their resource parents, but it found that those relationships could nonetheless be considered under the statute's fourth prong. Noting that the children had been in placement since July of 2018, the court stated that it could not "allow this case to go on forever" and identified the long delay in affording permanency to the children as a harm. The trial

14

court found that Antonia and Ian, who were in pre-adoptive homes, would suffer "significant harm" if they were reunified with their parents rather than adopted. The court also found that Ignacio and Josefina were visiting potential adoptive homes and were also at risk of harm if the parental rights of Divina and Javier were not terminated.

The trial court entered a judgment of guardianship terminating the parental rights of Divina and Javier to Ignacio, Josefina, Antonia, and Ian.

## C.

Divina appealed the trial court's termination of her parental rights, but Javier did not appeal the trial court's judgment.

In a thorough and thoughtful opinion, the Appellate Division affirmed the trial court's determination. D.C.A., 474 N.J. Super. at 24-30. The appellate court rejected Divina's argument that the Legislature's deletion of the second sentence from N.J.S.A. 30:4C-15.1(a)(2) barred trial courts from considering evidence of the child's relationship with resource parents in any aspect of the termination of parental rights determination. Id. at 25-26. The Appellate Division concluded that "[n]either the legislative history nor the plain text necessitates such a sweeping conclusion." Id. at 26.

The appellate court viewed N.J.S.A. 30:4C-15.1(a)'s fourth prong to mandate "an evidentiary inquiry into the status of children in placement, to

15

determine whether the child is likely to suffer worse harm in foster or adoptive care than from termination of the biological parental bond." Ibid. It noted that in that final stage of the analysis, a court may "find that remaining with an otherwise 'unfit' parent is still within a child's 'best interests' if there are significant concerns about the Division's ability to place a child with an appropriate caregiver." Ibid.

The Appellate Division cautioned that depriving the trial court of "information concerning the child's ability to forge bonds with resource caregivers would disharmonize the statute." Id. at 27. The court explained that, because a child may be placed with a relative as a resource caregiver, ignoring evidence of the bond between the child and that caregiver could undermine a parent's or kinship guardian's effort to maintain custody of the child. Id. at 26-28. The Appellate Division held that there was substantial evidence in the legislative history that when the Legislature enacted L. 2021, c. 154, it intended that trial courts consider the totality of the circumstances in deciding whether to terminate parental rights. Id. at 28.[7]

---

[7] The Appellate Division found persuasive a statement by a legislative aide, responding to a concern raised by a member of the Assembly at a Health Committee hearing, that the bill was intended to make clear that judges "should be considering the totality of the circumstances" rather than "focusing on one particular type" of harm to the child. D.C.A., 474 N.J. Super. at 28 (emphases omitted).

The Appellate Division therefore found no misapplication of the best interests standard "under either prongs two or four based upon the record," and it affirmed the termination of Divina's and Javier's parental rights. Id. at 29-30.

D.

We granted Divina's petition for certification. 253 N.J. 599 (2023). We also granted the applications of the Rutgers Child Advocacy Clinic and the Advocates for Children of New Jersey (jointly, RCAC) and of Legal Services of New Jersey (LSNJ) to appear as amici curiae.

II.

A.

Divina urges the Court to reverse the Appellate Division's judgment. She argues that when the Legislature amended N.J.S.A. 30:4C-15.1(a) in 2021, it intended that trial courts refrain from considering a child's relationship with a resource family in any aspect of its determination. Divina asserts that the Appellate Division improperly imported the language deleted from N.J.S.A. 30:4C-15.1(a)(2) and the common law comparative bonding doctrine into N.J.S.A. 30:4C-15.1(a)(4).

17

B.

The Division argues that the harm a child would suffer if separated from a resource family is relevant to the totality of the circumstances when a court considers the fourth prong of the best interests test. It notes that the Legislature amended N.J.S.A. 30:4C-15.1(a)(2), not N.J.S.A. 30:4C-15.1(a)(4), and that bonding information is important to ensure the child's safety, which remained a paramount concern in guardianship actions after the 2021 Amendment.

C.

The Law Guardian argues that the Appellate Division properly construed the plain language and legislative intent of N.J.S.A. 30:4C-15.1(a) and urges that we affirm the Appellate Division's decision.

D.

Amicus curiae RCAC contends that nothing in the 2021 Amendment bars a court applying the fourth prong from considering a child's relationship with the resource parents. Amicus notes that if we were to construe the statute to preclude all evidence of that relationship in the best interests analysis, New Jersey would be the only state to bar such evidence.

18

E.

Amicus curiae LSNJ asserts that when the Legislature amended N.J.S.A. 30:4C-15.1(a), it intended to revoke a court's authority to consider the potential harm resulting from a child's separation from the resource family at any stage of the best interests inquiry.

III.

A.

We review the trial court's factual findings in accordance with a deferential standard, and uphold those findings if they are grounded in substantial and credible evidence in the record. DYFS v. F.M., 211 N.J. 420, 448-49 (2012). We review de novo the Appellate Division's construction of N.J.S.A. 30:4C-15.1(a), according "no deference 'to the Appellate Division's or trial court's interpretive conclusions' about the meaning of a statute." DCPP v. J.R.-R., 248 N.J. 353, 368 (2021) (quoting DCPP v. Y.N., 220 N.J. 165, 177 (2014)).

We construe N.J.S.A. 30:4C-15.1(a) pursuant to familiar principles of statutory construction. Our aim is to "effectuate the Legislature's intent," ascribing to the statute's words "'their ordinary meaning and significance and read[ing] them in context with related provisions so as to give sense to the legislation as a whole.'" W.S. v. Hildreth, 252 N.J. 506, 518-19 (2023)

19

(quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)). It is only when "there is ambiguity in the statutory language that leads to more than one plausible interpretation" that courts "turn to extrinsic evidence, 'including legislative history, committee reports, and contemporaneous construction.'" DiProspero, 183 N.J. at 493 (quoting Cherry Hill Manor Assocs. v. Faugno, 182 N.J. 64, 75 (2004)).

"[W]hen amendments are passed jointly or as part of a legislative scheme, we must construe them together to make sense of the legislative intent." Hildreth, 252 N.J. at 519. "'[W]hen the Legislature includes limiting language in one part of a statute, but leaves it out of another,' a court should assume that it intended a different meaning." State v. Rangel, 213 N.J. 500, 514 (2013) (alteration in original) (quoting Ryan v. Renny, 203 N.J. 37, 58 (2010)). We apply the "well-established canon of statutory interpretation . . . that 'the Legislature is presumed to be aware of judicial construction of its enactments.'" State v. McCray, 243 N.J. 196, 217 (2020) (quoting Johnson v. Scaccetti, 192 N.J. 256, 276 (2007)).

B.

1.

"New Jersey's child-welfare laws balance 'two competing interests: a parent's constitutionally protected right "to raise a child and maintain a

20

relationship with that child, without undue influence by the [S]tate,'" and 'the State's parens patriae responsibility to protect the welfare of children.'" J.R.-R., 248 N.J. at 368 (alteration in original) (quoting DYFS v. A.L., 213 N.J. 1, 18 (2013)).  Termination of parental rights is "a weapon of last resort in the arsenal of state power," and the State's authority to take that step must be exercised "with caution and care, and only in those circumstances in which proof of parental unfitness is clear."  F.M., 211 N.J. at 447.  "The balance between parental rights and the State's interest in the welfare of children is achieved through the best interests of the child standard."  In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999).

From 1951 until September 10, 1991, New Jersey's termination of parental rights statute generally prescribed a best interests standard in certain termination cases; it included a child "under the care and custody of the Division whose best interests require that he be placed under guardianship" among other categories of children who could be the subject of an action to terminate parental rights.  N.J.S.A. 30:4C-15 (1990).  That iteration of the statute, however, prescribed no specific factors to guide our courts in determining whether termination of parental rights would be in the best interests of a child in the Division's care and custody.  See ibid.

21

In DYFS v. A.W., we identified the following factors for the court to apply in a termination of parental rights case: (1) "[t]he child's health and development have been or will be seriously impaired by the parental relationship"; (2) "[t]he parents are unable or unwilling to eliminate the harm and delaying permanent placement will add to the harm"; (3) "[t]he court has considered alternatives to termination"; and (4) "[t]he termination of parental rights will not do more harm than good." 103 N.J. 591, 604-11 (1986). We viewed the second factor to center not on the cause of the harm, but rather on "whether it is reasonably foreseeable that the parents can cease to inflict harm upon the children entrusted to their care." Id. at 607. Explaining the fourth factor, we stated that "what the concept conveys is that termination of parental rights will result, among other things, in a permanent resolution of the child's status." Id. at 610.

In 1991, the Legislature enacted the original version of N.J.S.A. 30:4C-15.1(a), codifying the best interests test defined in A.W.:

> The division shall initiate a petition to terminate parental rights on the grounds of the 'best interest of the child' pursuant to [N.J.S.A. 30:4C-15] if the following standards are met:
>
> a. The child's health and development have been or will continue to be endangered by the parental relationship;

b.  The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

c.  The division has made diligent efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

d.  Termination of parental rights will not do more harm than good.

[L. 1991, c. 275, § 7.]

The 1991 iteration of the termination of parental rights statute did not expressly direct courts to evaluate the child's relationship with the resource family as part of the best interests analysis.  Ibid.  We recognized, however, that the harm that a child would suffer if the court terminated that relationship was one of several factors in the analysis, if considered "in a broader context that includes as well the quality of the child's relationship with his or her natural parents."  In re Guardianship of J.C., 129 N.J. 1, 19 (1992).  We stressed that "[t]o show that the child has a strong relationship with the foster parents or might be better off in their custody is not enough," and that in order for the Division to prove that separating the child from the resource family would cause "enduring emotional or psychological harm," it must present proof including "the testimony of a well qualified expert who has had full

23

opportunity to make a comprehensive, objective, and informed evaluation of the child's relationship with the foster parent." Ibid.

2.

Three years after we decided J.C., the Legislature amended N.J.S.A. 30:4C-15.1(a)(2), adding language addressing harm due to a child's separation from the resource family to the second prong of the best interests test. See L. 1995, c. 416. The rest of the statute was left unchanged. The amended second prong of the best interests test required a finding that

> [t]he parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child . . . .
>
> [N.J.S.A. 30:4C-15.1(a)(2) (1996) (emphasis added).]

Following the 1995 amendment to N.J.S.A. 30:4C-15.1, we explained the role that evidence of the child's relationship with the resource family played in the second prong of the best interests test. K.H.O., 161 N.J. at 352-54. In addition, we confirmed the relevance of that relationship to the court's assessment of the evidence under the fourth prong, notwithstanding the absence of a specific reference to the child's relationship with the resource family in N.J.S.A. 30:4C-15.1(a)(4). Id. at 353-55. We held that "[t]he

24

question to be addressed under [the fourth] prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents." Id. at 355. We noted the importance of expert testimony in that inquiry, observing that

> [t]o determine whether the comparative harm is proscribed by the fourth prong in a case involving a child in foster care, such as K.H.O., the court must inquire into the child's relationship both with her biological parents and her foster parent. "Weighing the potential harm that terminating [the child's] relationship with her mother [might cause] against that which might come from removing her from her foster home is painfully difficult, but it is a decision that necessarily requires expert inquiry specifically directed to the strength of each relationship."
>
> [Ibid. (second alteration in original) (quoting In re Guardianship of J.C., 129 N.J. 1, 25 (1992)).]

Later case law decided under N.J.S.A. 30:4C-15.1(a) as amended in 1995 reaffirmed the importance of expert testimony comparing the child's bond with the resource family to the child's bond with birth parents under the fourth prong. See F.M., 211 N.J. at 453 (noting the importance of testimony by a well-qualified expert based on a thorough evaluation of the child's relationship with birth parents and resource parents); accord DYFS v. M.M., 189 N.J. 261, 281 (2007); DYFS v. A.R., 405 N.J. Super. 418, 442 (App. Div. 2009). We stated that the fourth prong of N.J.S.A. 30:4C-15.1(a) "serves as a

25

fail-safe against termination even where the remaining standards have been met" and "does not provide an independent basis for termination where the other standards have not been satisfied." DYFS v. G.L., 191 N.J. 596, 608-09 (2007); accord F.M., 211 N.J. at 453.

In short, by the time the Legislature amended N.J.S.A. 30:4C-15.1(a) in 2021, our courts had long considered a child's relationship with a resource family to be relevant not only when they assessed the evidence under the second prong of the best interests test, but also when they applied the fourth prong. See F.M., 211 N.J. at 453; M.M., 189 N.J. at 281; K.H.O., 161 N.J. at 353-55.

3.

In May 2021, the Legislature considered a bill that would, in part, amend the second prong of the best interests test. See A. 5598/S. 3814 (L. 2021, c. 154). As to the second prong, a statement appended to the bill explained that the bill was intended to require the Division "to consider placement of children with relatives or kinship guardians" when determining the placement of children, and to change "certain standards for initiating petitions to terminate parental rights." Ibid. The bill proposed to delete the language "[s]uch harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to

26

the child" from the best interest test's second prong, N.J.S.A. 30:4C-15.1(a)(2).  In addition, it incorporated amendments to provisions of the statutory scheme for Kinship Legal Guardianship (KLG), N.J.S.A. 3B:12A-2, -5, and -6.  See L. 2021, c. 143.[8]  It also included amendments to N.J.S.A. 9:6-8.30, -8.31, and -8.54, and to N.J.S.A. 30:4C-12.1, which address removals by the Division.  Ibid.  The Senate and Assembly passed the bill on June 21,

---

[8]  When a court orders KLG, the child is placed with a caregiver with whom the child has a kinship relationship and "who is willing to assume care of a child due to parental incapacity, with the intent to raise the child to adulthood."  N.J.S.A. 3B:12A-2.  In N.J.S.A. 3B:12A-1(b), the Legislature recognized that

> [a]n increasing number of relatives . . . find themselves providing care on a long-term basis to . . . children without court approved legal guardianship status because the caregivers either are unable or unwilling to seek termination of the legal relationships between the birth parent and the child, particularly when it is the caregiver's own child or sibling who is the parent.  In these cases, adoption of the child is neither feasible nor likely, and it is imperative that the State create an alternative, permanent legal arrangement for children and their caregivers.  One such alternative arrangement, which does not require the termination of parental rights, is a court awarded kinship legal guardianship . . . .

The Legislature defined a "kinship relationship" for purposes of KLG to be "a family friend or a person with a biological or legal relationship with the child." Ibid.  A child's KLG placement "does not sever the legal relationship between the child and the parent."  DYFS v. R.G., 217 N.J. 527, 558 (2014).

27

2021, and Governor Murphy signed it into law on July 2, 2021. See L. 2021, c. 154.

The first section of the new law stated the Legislature's findings:

a. Foster care is intended by existing state and federal statute to be temporary.

b. Kinship care is the preferred resource for children who must be removed from their birth parents because use of kinship care maintains children's connections with their families. There are many benefits to placing children with relatives or other kinship caregivers, such as increased stability and safety as well as the ability to maintain family connections and cultural traditions.

c. Federal law permits kinship legal guardianship arrangements to be used when the child has been in the care of a relative for a period of six months.

d. Parental rights must be protected and preserved whenever possible.

e. Children are capable of forming healthy attachments with multiple caring adults throughout the course of their childhood, including with birth parents, temporary resource parents, extended family members, and other caring adults.

f. The existence of a healthy attachment between a child and the child's resource family parent does not in and of itself preclude the child from maintaining, forming or repairing relationships with the child's parent or caregiver of origin.

g. It is therefore necessary for the Legislature to amend current laws to strengthen support for kinship caregivers, and ensure focus on parents' fitness and the benefits of preserving the birth parent-child

28

relationship, as opposed to considering the impact of severing the child's relationship with the resource family parents.

[L. 2021, c. 154 § 1.]

Since the 2021 Amendment, N.J.S.A. 30:4C-15.1(a) has provided as follows:

The division shall initiate a petition to terminate parental rights on the grounds of the "best interests of the child" pursuant to [N.J.S.A. 30:4C-15] if the following standards are met:

a. The child's safety, health, or development has been or will continue to be endangered by the parental relationship;

b. The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;

c. The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

d. Termination of parental rights will not do more harm than good.

Thus, when the Legislature enacted the 2021 Amendment to N.J.S.A. 30:4C-15.1(a)(2), it left unaltered the first, third, and fourth prongs of the best interests standard. See N.J.S.A. 30:4C-15.1(a)(1), (a)(3), (a)(4).

## C.

We share the Appellate Division's interpretation of the Legislature's intent when it amended N.J.S.A. 30:4C-15.1(a)(2) on July 2, 2021. See D.C.A., 474 N.J. Super. at 25-29. The Legislature acted to preclude trial courts from considering harm resulting from the termination of a child's relationship with resource parents when they assess parental fitness under the second prong, but not to generally bar such evidence from any aspect of the trial court's inquiry. See L. 2021, c. 154.

The amendment's plain language makes clear that intent.[9] The Legislature made a single change to N.J.S.A. 30:4C-15.1(a): the deletion of the sentence, "[s]uch harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child," from N.J.S.A. 30:4C-15.1(a)(2). See L. 2021, c. 154. It did not otherwise amend the statute. That is particularly

---

[9] Because we view the plain language of L. 2021, c. 154 to reveal the Legislature's intent, we do not rely on committee reports or other extrinsic evidence to construe the amendment. See Hildreth, 252 N.J. at 519 ("When the plain language of a statute is clear and unambiguous, we apply the law as written."); accord DiProspero, 183 N.J. at 493. We do not agree with the Appellate Division's reliance on the comments of a legislative aide about the Legislature's goals in enacting L. 2021, c. 154, § 1(b). See D.C.A., 474 N.J. Super. at 28. Courts should exercise caution in inferring legislative intent from statements made by legislative staff.

significant because courts had been considering comparative harm in applying prong four of the best interests test for decades, see F.M., 211 N.J. at 453; M.M., 189 N.J. at 281; K.H.O., 161 N.J. at 353-55, as the Legislature was aware, see McCray, 243 N.J. at 217.

The Legislature's decision to change the second prong of the statutory test comports with the goals it expressly set forth when it amended N.J.S.A. 30:4C-15.1 and seven other statutes in 2021. As the legislative findings confirm, the Legislature sought to protect and preserve parental rights "whenever possible." L. 2021, c. 154, § 1(d). It did not view a healthy relationship between children and resource parents to "in and of itself preclude" healthy relationships with parents or caregivers of origin. Id. § 1(e), (f). The Legislature recognized kinship care as "the preferred resource for children who must be removed from their birth parents" because it "maintains children's connections with their families." Id. § 1(b). It therefore sought to "strengthen support for kinship caregivers." Id. § 1(g). And the Legislature intended that our courts focus on "parents' fitness and the benefits of preserving the birth parent-child relationship," not on "considering the impact of severing the child's relationship with the resource family parents." Ibid.

The Legislature thus amended N.J.S.A. 30:4C-15.1(a)(2) to ensure that parental fitness -- not the child's bond with resource parents -- is the core

31

inquiry when a judge considers the best interests standard's second prong in a termination of parental rights case. Id. § 1. It did not identify as a legislative goal the elimination of that bond as a factor in any component of the best interests analysis. Ibid. Indeed, as the Appellate Division noted, precluding the admission of all evidence concerning resource family placements could in some settings undermine the Legislature's objective to promote kinship caregivers and preserve family bonds. See D.C.A., 474 N.J. Super. at 25-26.

In L. 2021, c. 154, which amended no fewer than eight statutes, the Legislature could easily have barred evidence of a child's relationship with resource parents in a court's inquiry under the fourth prong of the statutory standard, or entirely precluded consideration of such evidence in any aspect of a court's inquiry. Because the Legislature did not amend any provision of the statute other than N.J.S.A. 30:4C-15.1(a)(2), we discern no legislative intent for so fundamental a change. Ibid. Were we to infer such intent absent a clear indication from the Legislature, we would undermine the State's parens patriae obligation to protect the welfare of children. See J.R.-R., 248 N.J. at 368; J.C., 129 N.J. at 10. Such a ruling would deprive a court of crucial information as it

32

determines a child's future, and could imperil children whom New Jersey is charged to protect.  See K.H.O., 161 N.J. at 348.[10]

Accordingly, we concur with the Appellate Division's holding that the 2021 Amendment precludes a court from considering the bond between a child and resource parents under the second prong of the best interests standard but does not bar such evidence when the court addresses that standard's fourth prong.  See D.C.A., 474 N.J. Super. at 29.  We agree with the Appellate Division's construction of the 2021 Amendment.

## D.

We also agree with the Appellate Division that the trial court's application of N.J.S.A. 30:4C-15.1 to Divina's parental rights to Ignacio, Josefina, Antonia, and Ian was a proper exercise of its discretion.  See id. at 29-30.

---

[10]  Indeed, were we to construe N.J.S.A. 30:4C-15.1(a) to bar all evidence of a child's relationship with resource parents in a best interests analysis, New Jersey would be the sole state to impose such a rule.  Twenty states have enacted statutes requiring that courts consider the relationship between a resource parent in a best interests inquiry.  See, e.g., Alaska Stat. § 47.10.088; Conn. Gen. Stat. § 17a-112; Me. Stat. tit. 22 § 4055.  Case law in several other states provides that a best interests of the child analysis may include consideration of the relationship between resource parent and child.  See, e.g., Bennett v. Jeffreys, 356 N.E.2d 277, 285 (N.Y. 1976); In re H.J., 200 A.3d 891, 898-99 (N.H. 2018); In re D.C.D., 105 A.3d 662, 677 (Pa. 2014).  No state expressly prohibits consideration of the relationship between resource parent and child in the best interests analysis.

We view the evidence on which the trial court relied as to prong one -- Divina's and Javier's numerous domestic violence incidents, some in the presence of their children, and their inability to provide what Dr. Lee termed "minimally adequate parenting" for the children -- to satisfy the Division's burden of proof.

We reach the same conclusion with respect to the evidence supporting the trial court's conclusion as to prong two. The court properly refrained from invoking evidence regarding the children's relationships with their resource parents, and instead relied on the parents' pattern of violent conduct continuing during trial, Divina's "outlandish" statements, and Dr. Lee's opinion that the parents would not ensure a safe and stable home for the children.

As to the third prong, the trial court cited extensive evidence of the Division's efforts to provide services to Divina and Javier, as well as its exploration of alternatives to termination of parental rights.

And with respect to the fourth prong, the trial court carefully weighed the consequences that would result from termination of parental rights, relying on Dr. Lee's expert testimony, evidence of the parents' conduct, and the children's need for permanency.

We consider the trial court's detailed findings of fact as to the best interests of Ignacio, Josefina, Antonia, and Ian to be amply supported by substantial and credible evidence in the record. We view the court's determination that the Division met its burden as to all four prongs of N.J.S.A. 30:4C-15.1(a) to constitute a proper exercise of its broad discretion. See F.M., 211 N.J. at 448-49.

## IV.

The judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER and JUSTICES SOLOMON, PIERRE-LOUIS, WAINER APTER, FASCIALE, and NORIEGA join in JUSTICE PATTERSON's opinion.

35